Gary Ray Fraley, SBN: 80056
Paramprit (Paul) Singh Bindra, SBN: 311916
Fraley & Fraley
1401 El Camino Avenue, Suite 370
Sacramento, CA 95815
Tel: 916-485-5444
Fax: 916-485-8969
Email: fraleyandfraley@gmail.com

Attorneys for Michael Angelo Farrace

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 2013-24657 |
| Michael Angelo Farrace, | Chapter 13 |
| Debtor, | Adversary No.: |
| Michael Angelo Farrace, | **COMPLAINT FOR DECLARATORY** |
| Plaintiff | **RELIEF, VIOLATION OF THE** |
| v. | **AUTOMATIC STAY AND RELATED** |
| New Penn Financial, LLC DBA Shellpoint Mortgage Servicing, | **STATE AND FEDERAL CAUSES OF ACTION** |
| Defendant. | |

Plaintiff Michael Angelo Farrace, Chapter 13 Debtor, alleges as follows:

### JURISDICTION AND VENUE

1.      This adversary proceeding arises out of and is related to the above-captioned Chapter 13 case of Michael Angelo Farrace, Case No. 2013-24657.

2.      Defendant herein has a claim against Plaintiff, as defined by 11 U.S.C. §101(5). The complaint, as set forth herein, involves the amounts of the secured status of a claim pursuant to 11 U.S.C. §501-§508, and as such, constitutes a "core" proceeding pursuant to 28 U.S.C. §157(b).

3.    To the extent that any part of this matter is deemed non-core, the Plaintiff consents to this Court in rendering final judgment.

4.    Plaintiff contends that the related State causes of action are core matters as they would not exist outside of the bankruptcy context; involve the allowance of a claim under 11 U.S.C. §157(b)(2)(A); involve matters subject to 11 U.S.C. § 157(b)(2)(O); and inextricably bound to the claims allowance process.

5.    Venue for this adversary proceeding is proper pursuant to 28 U.S.C. §1409(a).

## PARTIES

6.    Plaintiff, Michael Angelo Farrace, is a debtor in bankruptcy Case No. 2013-24657 and resides at 2340 Skube Lane, Sacramento, California.

7.    Defendant, New Penn Financial, LLC DBA Shellpoint Mortgage Servicing is a Limited Liability Company organized under the laws of Delaware whose principal address is 4000 CHEMICAL RD STE 200 PLYMOUTH MEETING PA 19462 with agent for service being Corporation Service Company which will do business in California as CSC - Lawyers Incorporating Service (hereinafter "SHELLPOINT").

## FACTUAL ALLEGATIONS

8.    Plaintiff filed their Chapter 13 case on April 4, 2013.

9.    An order for relief was entered in this case on April 4, 2013, pursuant to 11 U.S.C § 301, thus triggering an automatic stay, pursuant to 11 U.S.C. § 362(a) of all debt collection against the Debtors.

10.    Citimortgage, the predecessor to SHELLPOINT filed a proof of claim in this case on May 23, 2013 as Claim Number 3 and in doing so, has knowledge of the bankruptcy case of debtor. See Exhibit A. Said claim was assigned to SHELLPOINT on February 29, 2016.

11.    On June 11, 2013, the debtor's Chapter 13 plan was confirmed. See Docket Report, Exhibit B and Plan, Exhibit C.

12.    Plaintiff contends that Defendant is violating the confirmed plan (Exhibit C) which provides for the method in applying payments, Section 2.08(b)(5), as the payments are not applied as if the claim was current and no arrearage existed:

*(5) Post-petition payments made by Trustee and received by the holder of a Class 1 claim shall be applied as if the claim were current and no arrearage existed on the date the case was filed.*

13.     Specifically, attached as Exhibit D is a spreadsheet which details the beginning balance from the POC filed by the Defendant, Exhibit A, which applies the principal and interest portion of the payments, which reveals that the beginning balance for the ongoing payments from the trustee to be $169,920.61, which is the required balance pursuant to plan provision Section 2.08(b)(5).

14.     Attached as Exhibit E is a spreadsheet that applies the payments made post-petition by the trustee. The running balance as of the payment made on January 30, 2017 calculates the balance as $115,134.45, however, a statement provided by SHELLPOINT, Exhibit F, around the same period, shows a balance of $127,254.74, a difference of $12,120.29, to the detriment of the Plaintiff debtor.

15.     Substantial questions exist related to the impound account as the POC filed in Exhibit A reveals no shortage but the impound analysis contained therein shows a negative for calculating balances. The spreadsheet attached as Exhibit D reveals that on the day of the case being filed, allowing for the loan being current as of the date of filing as required by the plan, should have shown an escrow balance in the positive of $15,555.13. A true analysis on the impound account will be rendered more accurate during the discovery process.

16.     Plaintiff contends this is merely the "tip of the iceberg" in relation to the inaccuracy of the allocation of payments by Defendant thereby shorting the escrow/impound account, misreporting interest paid to the Department of Treasury and misreporting the loan overall related to balances due and owing across the entire spectrum of the loan, i.e. principal balance, impound account.

17.     Further, Plaintiff contends that such an allocation is solely beneficial to the Defendant, overpaying them interest that they are not legally entitled to receive.

18.     If this misapplication of payments were to continue, upon plan completion, the impound account will be short and the balances will not be accurate to effect a successful fresh start for the debtor.

19.     Several Notices of Mortgage Payment Change have been filed by the Defendant, Exhibit G, which contain flawed impound analysis as they do not properly account for the impound account as stated above.

---

**COMPLAINT FOR DECLARATORY RELIEF, VIOLATION OF THE AUTOMATIC STAY AND RELATED STATE AND FEDERAL CAUSES OF ACTION**

20.     Further, since the filing of this bankruptcy case by the debtor, Defendant has been charging inspection fees and deducting them from the payments being made through the trustee as reflected on the statements reflected in Exhibit H.  These inspection fees serve no purpose, have not been requested under FRBP §3002 and are unconscionable considering the repetitive nature of imposing the fees.

21.     The acts of the Defendant is similarly related to untimely providing Notices of Mortgage Payment Change consistent with the recent administrative settlement with the United State Trustee in the Case of In re Green, Case No. 11-33377-TJC in the United States Bankruptcy Court for the District of Maryland, Exhibit I, with Wells Fargo Bank.

22.     Plaintiff requests that he be given similar remedies, in the form of credits to his impound account for untimely filing the Notices of Mortgage Payment Change, not allowing inspection fees and for failing to provide Notices of Fees as was given the Plaintiff in the Green supra case.

23.     SHELLPOINT's conduct has caused Plaintiff to experience worry and concern that are separate from the anxiety felt about the bankruptcy filing. His reactions and emotions are not fleeting or inconsequential. He has suffered significant emotional harm as a result of Defendant's conduct. The circumstances surrounding the above acts make it obvious that a reasonable person would suffer significant emotional harm. He has suffered actual damages in the forms of out-of-pocket expenses, attorney's fees, and emotional distress.

### BANKRUPTCY LAWS PREEMPTING STATE LAW IS LIMITED

24.     There are many instances in the Bankruptcy Code where Congress either has deferred to state law or has expressly and affirmatively incorporated state law into the bankruptcy scheme. See Sherwood Partners Inc. v. Lycos, Inc., 394 F.3d 1198, 1201 (9th Cir.2005).

25.     States are not precluded by the Constitution from enacting insolvency laws provided those laws do not conflict with federal bankruptcy legislation.  See Sturges v. Crowninshield, 4 Wheat. 122, 17 U.S. 122, 195-97, 4 L.Ed. 529 (1819); Rhodes v. Stewart, 705 F.2d 159, 163 (6th Cir.1983); Matter of Sullivan, 680 F.2d 1131, 1137 (7th Cir.1982).

26.     Plaintiff contends the underlying State law claims do not interfere with the bankruptcy court's jurisdiction, as a finding of liability under the State law claims would not determine whether the

1    automatic bankruptcy stay was violated, plan failed to be complied with or a Proof of Claim objection

2    is sustained.

3    27.      The filing of a proof of claim triggers the claims allowance and disallowance process, and,

4    accordingly, the bankruptcy court's core jurisdiction under 28 U.S.C. §157(b)(2)(B).

5    28.      The State law claims are "related to" this bankruptcy case as its their outcomes both  (1) alter

6    the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration

7    of the estate."

8                          **I. FIRST CLAIM FOR RELIEF**
9                                  **Stay Violation**

10   29.      The foregoing paragraphs are incorporated herein by reference.

11   30.      Plaintiff confirmed their Chapter 13 Plan which provided for the Defendant's Secured Claim in

12   Class 1 of the Plan.  No appeal was taken from the Order Confirming the Chapter 13 Plan and the

13   Order in the Plan, Section 2.08(b)(5):

14        *(5) Post-petition payments made by Trustee and received by the holder of a Class 1 claim shall be*
15        *applied as if the claim were current and no arrearage existed on the date the case was filed.*

16   31.      This Plan provision ordered by the Court was a final order, not subject to collateral attack. The

17   order confirming the Plan is *res judicata* as to all justiciable issues decided by confirmation.

18   32.      As such, the Plan is binding on the Debtor and all creditors. See, 11 U.S.C. § 1327(a); United

19   Student Aid v. Espinosa, 559 U.S. 260, 270, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010); Finova Capital

20   Corp. v. Larson Pharmacy Inc. (In re Optical Technologies, Inc.), 425 F.3d 1294, 1300-1302 (11th

21   Cir.2011); Ford Motor Credit Co. v. Bankruptcy Estate of Parmenter (In re Parmenter), 527 F.3d 606,

22   608-609 (6th Cir.2008); and Trulis v. Barton et al., 107 F.3d 685, 691 (9th Cir.1995).

23   33.      In addition to the *res judicata* effect of confirmation, it is the Chapter 13 Plan, by which the

24   debtor commits him or herself, which becomes the modified contract between the debtor and creditors.

25   Hillis Motors v. Hawaii Automobile Dealers' Association (In re Hillis Motors), 997 F.2d 581, 588 (9th

26   Cir. 1993) (A confirmed reorganization plan resembles a consent decree and should be construed

27   basically as a contract); Max Recovery v. Than (In re Than), 215 B.R. 430, 435 (9th Cir. BAP 1997).

28   ("Another way of looking at the binding effect of confirmation is that the plan is a contract between

---

**COMPLAINT FOR DECLARATORY RELIEF, VIOLATION OF THE AUTOMATIC STAY AND**
**RELATED STATE AND FEDERAL CAUSES OF ACTION**

1   the debtor and the debtor's creditors.") The order confirming a Chapter 13 plan, upon becoming final,

2   represents a binding determination of the rights and liabilities of the parties as specified by the plan. 8

3   COLLIER ON BANKRUPTCY ¶ 1327.02 (Alan N. Resnick & Henry J. Sommer eds. 16th ed.)

4   34.     The bankruptcy stay under 11 U.S.C. §362 remains in place, merely modified as per the plan,

5   Section 2.08(b)(4), of which, in this case is limited to:

6       (4) The automatic stay is <u>modified</u> to permit the holders of Class 1 claims <u>to send statements,</u>
7       <u>impound, and escrow notices, and notices concerning interest rate adjustments or the assessment</u>
        <u>of fees and costs</u> to Debtor.
8

9   35.     Therefore, not allocating payments per the terms of the plan[1] would be a violation of the

10  bankruptcy stay and the Court's contempt powers under 11 U.S.C. §105.

11  36.     Defendant's conduct violated 11 U.S.C. § 362(a) by not following the terms of the plan,

12  specifically provision Section 2.08(b)(5) by attempting to collect more money then they are legally

13  entitled to.

14  37.     The facts stated throughout this complaint call into question all payments that have been sent

15  or will be sent to SHELLPOINT or its predecessor.

16  38.     The broad impact of this violation extends to improper tax reporting, excessive interest rate

17  payments to the creditor, escrow not being properly paid, the principal balance being over or under

18  reported and the unlawful taking of funds from the Plaintiff.

19  39.     Plaintiffs request an Order declaring the Defendant guilty of violating the automatic stay; and

20  awarding Plaintiff compensatory damages, punitive damages, and costs pursuant to 11 U.S.C. §

21  362(k).

22  40.     Further, Plaintiff requests that the Defendant provide a full and accurate accounting to the

23  Court and for the Court to make a determination of the correct amounts due and owing pre-petition

24  and post-petition consistent with the orders of this Court related to the plan and the undisputed proof

25  of claim filed by SHELLPOINT.

26  ///

27  ///

28  [1] Plaintiff contends that the mishandling of payments, to the benefit of the creditor, is conversion under California law.

**COMPLAINT FOR DECLARATORY RELIEF, VIOLATION OF THE AUTOMATIC STAY AND
RELATED STATE AND FEDERAL CAUSES OF ACTION**

## II. SECOND CLAIM FOR RELIEF
## OBJECTION TO PROOF OF CLAIM

41.     Plaintiffs reaffirm and re-allege all paragraphs hereinabove as if set forth more fully herein below.

42.     Plaintiff objects to the Post Petition Fees and Expenses from their statements (Exhibit H) and the Notice of Mortgage Payment Change (Exhibit G) which sought to modify the Proof of Claim filed by SHELLPOINT as claim #3 (Exhibit A) for the errors stated above.

43.     In addition, Plaintiff believes that all of the dollar amounts are questionable requiring a thorough accounting of payments made prior to the delinquency claimed in the Proof of Claim up to the time of the bankruptcy filing.

44.     Plaintiff further contends that SHELLPOINT is mixing the pre-petition and post-petition amounts and improperly allocating the principal, interest, charges and escrow/impound as to cause a shortage in the escrow account.

45.     Plaintiff contends that when you look at the Proof of Claim, Exhibit A and spreadsheets incorporated in Exhibit D and E, none of it reconciles with each other. This failure to properly allocate payments is leading to the Plaintiff completing their plan in default with SHELLPOINT.

46.     Based on the facts stated above, the POC, and the Notice of Mortgage Payment Change are inaccurate.

47.     This objection to the POC, Post Petition Fees and Expenses in their statements and Notice of Mortgage Payment Change is brought pursuant to 11 U.S.C. §502(b) and Federal Rule of Bankruptcy Procedure §3007(b).

48.     As parties in interests, as the Debtor in the above reference bankruptcy case, Plaintiff has standing to object to the POC, Post Petition Fees and Expenses and Notice of Mortgage Payment Change.

49.     The Plaintiff asserts that the amounts demanded are negligently demanded to the detriment of the debtor.

50.     The Debtors further assert that pursuant to FRBP §9011 and FRCP §11, Defendant has not performed the proper due diligence sufficient to even file the notices thereby acting in a negligent

1   manner to the detriment of the debtor's plan of reorganization.  A Court may impose sanctions for

2   violation of local rules only upon showing of bad faith, willful disobedience, or gross negligence or

3   recklessness.  See Zambrano v. City of Tustin, 885 F.2d 1473 (9th Cir. 1989). Court may award

4   sanctions even if it lacks subject matter jurisdiction. See In re Balboa Improvements, Ltd., 99 B.R. 966

5   (9th Cir. B.A.P. 1989).

6   51.     In addition, under 11 U.S.C. §105, the Court may issue any order or judgment necessary or

7   appropriate to carry out the provisions of the bankruptcy law.  The relief requested by the debtor

8   herein is consistent with the powers granted the Court under 11 U.S.C. §105.

9   52.     Pursuant to FRBP §3006, Defendant cannot withdraw the POC and Notice of Mortgage

10  Payment Change after the filing of this adversary complaint.

11  53.     Plaintiff needs additional facts and evidence of the allocation of payments made prior to the

12  arrearages being calculated and the breakdown of payments as required but omitted from the POC and

13  Notice of Mortgage Payment Change to present to the Court a defensible analysis of a proper POC

14  and Notice of Mortgage Payment Change.  At present, the information provided by the Defendant is

15  so lacking in information that no such analysis by the Plaintiff could be incorporated into this

16  complaint beyond speculation.

17  54.     Further, Plaintiff asserts that the improper allocation of payments has caused the Defendant to

18  improperly report to the Department of the Treasury accurate information on how much interest has

19  been paid which has resulted in harm to Plaintiffs as they have not taken the proper tax deductions on

20  their taxes requiring them to amend the tax returns at additional cost.

21  55.     Defendant has a duty to file correct Mortgage Interest Statement Form 1098-INT with the

22  Internal Revenue Service.  Said form is transmitted along with a Form 1096 which declares under

23  penalty of perjury that the information contained on the Forms is accurate.  Plaintiff contends that the

24  allocation of payments is negligently performed rendering them to know the information being sent to

25  IRS is not correct despite their assertion under penalty of perjury that it is.

26  56.     The Debtors therefore finally assert that sufficient questions have been raised to challenge the

27

28

---

**COMPLAINT FOR DECLARATORY RELIEF, VIOLATION OF THE AUTOMATIC STAY AND
RELATED STATE AND FEDERAL CAUSES OF ACTION**

1 | validity of the claim.[2]

2 | 57.      Therefore, Plaintiff requests that the POC, Post Petition Fees and Expenses contained in their

3 | statements and Notice of Mortgage Payment Change be disallowed as a valid claim and requests after

4 | all the facts are presented, that the Court determine the proper amount of the claim.

5 | 58.      The contract, the Note and Deed of Trust, have an attorney's fees provision and Plaintiff

6 | requests attorney's fees pursuant to said contract under the reciprocal attorney's fees provisions of

7 | Calif. Civil Code §1717.

8

### III. THIRD CLAIM FOR RELIEF
### DECLARATORY RELIEF

9

10 | 59.      Plaintiffs reaffirm and re-allege all paragraphs hereinabove as if set forth more fully herein

11 | below.

12 | 60.      Plaintiff, a debtor in bankruptcy, is performing a confirmed Chapter 13 Plan.

13 | 61.      An actual controversy exists between the Plaintiff and Defendant on the application of

14 | mortgage payments received by Defendant as contained in the factual allegations above.

15 | 62.      These issues raised above call into question all payments sent and to be sent to SHELLPOINT.

16 | 63.      Plaintiff contends that the Internal Revenue Service form 1098 provided by the Defendants

17 | during the period of this bankruptcy is inaccurate.  When the Defendant filed form 1098 with the

18 | Internal Revenue Service they did so with a IRS form 1096, transmittal, which declares under penalty

19 | of perjury that the information reported was accurate.  Plaintiff contends the form 1098 is not

20 | accurate.

21 | 64.      Plaintiff contends he is current on his Chapter 13 plan.

22 | 65.      The contract, the Note and Deed of Trust, have an attorney's fees provision and Plaintiff

23 | requests attorney's fees pursuant to said contract under the reciprocal attorney's fees provisions of

24 | Calif. Civil Code §1717.

25 | 66.      Plaintiff requests that the Court determine the respective rights as to amounts due and owing to

26

27 | [2] The objecting party must produce evidence tending to defeat the claim that is of a probative force equal to that of the creditor's proof of claim. *In re Consolidated Pioneer Mortgage*, 178 B.R. 222 (9th Cir. B.A.P. 1995), *aff'd*. 91 F.3d 151 (9th Cir. 1996).  If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.  *In re Allegheny Inter.Inc.*, 954 F.2d 167, 173 (3rd Cir. 1992).

28

**COMPLAINT FOR DECLARATORY RELIEF, VIOLATION OF THE AUTOMATIC STAY AND
RELATED STATE AND FEDERAL CAUSES OF ACTION**

1  the Defendants so they can exit their Chapter 13 plan with the definitive amounts due and owing and

2  with the fresh start he had filed the case for.

3  67.     Further, Plaintiff requests that the Court determine the proper amounts that should have been

4  reported to the Internal Revenue Service on form 1098 and order SHELLPOINT to file amended

5  1098's and order SHELLPOINT to reimburse Plaintiff for the cost of preparing and filing amended

6  tax returns and any penalties due therein.

7  68.     Further, Plaintiff requests that the Court determine the correct application by SHELLPOINT of

8  the plan payments for the ongoing mortgage payments.

9  69.     Further, Plaintiff requests that the Court determine the correct application by SHELLPOINT of

10  the plan payments for the arrears mortgage payments.

### IV. FOURTH CLAIM FOR RELIEF
### CONVERSION (Common Law)

13  70.     Plaintiffs reaffirm and re-allege all paragraphs hereinabove as if set forth more fully herein

14  below.

15  71.     Plaintiff is sending payments to the bankruptcy trustee for, among other things, the purpose of

16  paying the ongoing payments and pre-petition arrears of the Defendant.

17  72.     Trustee has sent those payments as required under the confirmed plan. The Bankruptcy

18  Trustee does not have any claim or assertion that they own the funds paid to them by the Plaintiff but

19  are an intermediary collecting and distributing payments per the plan ordered by the Court.

20  73.     Upon receipt of the payments from the Trustee, paid by the Plaintiff, the Defendant was to

21  allocate said payments according to the terms of the plan.

22  74.     Instead, Defendants diverted the funds to be paid differently than the plan provided for, in

23  effect skimming additional funds from the payments for their own benefit.

24  75.     Conversion is the wrongful exercise of dominion over the personal property of another. See,

25  De Vries v. Brumback (1960) 53 Cal. 2d 643, 647 (conversion is "an act of willful interference with

26  personal property, done without lawful justification, by which any person entitled thereto is deprived

27  of the use and possession of the personal property").

28  76.     Defendant has reimbursed itself for inspection fees not approved by the Court and from funds

---

**COMPLAINT FOR DECLARATORY RELIEF, VIOLATION OF THE AUTOMATIC STAY AND
RELATED STATE AND FEDERAL CAUSES OF ACTION**

1  diverted from the plan provisions.

2  77.      Plaintiff owns the funds[3] sent to Defendant through the bankruptcy trustee and gave those

3  funds to Defendant for the sole purpose to be applied to payments to the Defendant per the terms of

4  the plan.

5  78.      Defendant instead disposed of the funds[4] given it differently then Plaintiff tendered and in

6  violation of the plan and was therefore inconsistent with the property rights in the funds of the

7  Plaintiff.

8  79.      As a result, Plaintiff has suffered damages by improper tax reporting, excessive interest rate

9  payments to the Defendant, escrow payments not being properly paid, the principal balance being over

10  or under reported and the unlawful taking of funds from the Plaintiff.

11  80.      As such, Plaintiff requests as damages:

12     a.  Money damages: damages pursuant to California Civil Code § 3336, by 1) value at the time of

13         conversion with interest; or 2) Amount sufficient to indemnify the Plaintiff injured for the loss

14         which is the natural, reasonable, and proximate result of the wrongful act, which could have

15         been avoided with the proper degree of prudence (i.e. tax consequences).

16     b.  Punitive damages: Exemplary or punitive damages as the acts of Defendants with were done

17         malice or oppression. See, Cal. Civ. Code § 3357.

18                              **V. FIFTH CLAIM FOR RELIEF**
19          **UNLAWFUL, FRAUDULENT AND UNFAIR BUSINESS ACTS AND PRACTICES**

20  81.      Plaintiffs reaffirm and re-allege all paragraphs hereinabove as if set forth more fully herein

21  below.

22                              STATUTORY BACKGROUND

23  82.      California Business and Professions Code Section 17200 et seq., The Unfair Competition Law,

24
25  [3] Money is considered property under conversion cause of action for a specific identifiable sum of money. See, Haigler v. Donnelly (1941) 18 Cal. 2d 674, 681; Witkin § 703.
26  [4] Intentional acts causing substantial interference with an owner's property right. See, Enterprise Leasing Corp. v. Shugart Corp. (1991) 231 Cal. App. 3d 737, 748 (plaintiff need only show that he was entitled to possession at time of conversion, later recovery of property does not preclude conversion claim); Witkin § 708. Control may be sufficient: manual taking of the
27  plaintiff's personal property is not required; any wrongful assumption of control may constitute actual interference. See, Gruber v. Pacific States Savings & Loans Co. (1939) 13 Cal. 2d 144, 147.

28

1  | California Business and Professions Code section 17200, provides that "unfair competition" shall

2  | mean and include any unlawful, unfair, or fraudulent business practice.

3  | 83.    Section 17203 of the California Business and Professions Code provides that "*[a]ny person*

4  | *who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court*

5  | *of competent jurisdiction.*" The court may make such orders or judgments as may be necessary to

6  | prevent the use or employment by any person of any practice which constitutes unfair competition or

7  | as may be necessary to restore any person in interest any money or property, real or personal, which

8  | may have been acquired by means of such unfair competition.

9  | 84.    Section 17203 authorizes courts to award injunctive relief or restitution:

10 | *[S]uch orders or judgments ... as may be necessary ... to prevent the use or employment by*
11 | *any person of any practice which constitutes unfair competition, as defined in this chapter, or as*
   | *may be necessary to restore to any person ... any money or property ... which have been acquired*
12 | *by means of such unfair competition.*

13 |                              SPECIFIC FACTS

14 | 85.    Defendant SHELLPOINT has filed a Proof of Claim and filed amendments to the Proof of

15 | Claim, see Exhibits A and G, in the Plaintiff's underlying bankruptcy that are improperly prepared.

16 | 86.    Plaintiff contends that the principal due on the Proof of Claim is inaccurate in that payments

17 | made prior to the bankruptcy case being filed were not properly paid to principal and interest portions

18 | of the payment consistent with the terms of the note.  Specifically payments received for principal,

19 | interest, impounds were diverted to other expenses or category of payments other than principal,

20 | interest and impounds.

21 | 87.    Plaintiff contends that the calculation of interest due on the Proof of Claim is inaccurate and

22 | the interest portion for those payments due is not properly obtained from the payment for that

23 | particular payment period.  Interest was in fact calculated on the improper principal balance.

24 | 88.    Plaintiff contends that late charges due on the Proof of Claim are inaccurate and payments

25 | were misapplied to earlier installment other the current one due at the time the payment was made

26 | thereby pyramiding late charges.

27 | 89.    Further, Plaintiff contends that Defendant is mishandling payments received it during the court

28 | ordered plan to their financial benefit and to the detriment of the Plaintiff and related California

---

**COMPLAINT FOR DECLARATORY RELIEF, VIOLATION OF THE AUTOMATIC STAY AND
RELATED STATE AND FEDERAL CAUSES OF ACTION**

consumers.

90.     These issues raised above call into question all payments sent and to be sent to SHELLPOINT.

91.     Plaintiff contends that this is a common business practice of SHELLPOINT detrimental to California consumers, especially those in bankruptcy.

92.     Plaintiff contends Defendants willfully engage in unfair business practices as stated above.

93.     Misrepresenting the amounts owed  generates substantial revenue to SHELLPOINT.

Unlawful Conduct.

94.     The unlawful prong of Section 17200 "*borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.*" Cal. Consumer Health Care Council v. Kaiser Found. Health Plan, Inc., 142 Cal. App. 4th 21, 47 (2006).

95.     Without interfering with the Court's jurisdiction over bankruptcy matters, Section 17200 creates a separate action dependent on the bankruptcy court's determination of a violation of bankruptcy law.

96.     Further, the remedies under 17200 are not intended to enhance or supplement the Federal Bankruptcy law but prohibit unfair business practices done in the State which harms all citizens of California.

97.     Here, SHELLPOINT has wrongly prepared a Proof of Claim and its related amendments in violation FRCP §11 and FRBP §9011.

98.     Here, SHELLPOINT violated the automatic stay under 11 U.S.C. §362.

99.     Further, SHELLPOINT has in facts skimmed funds from the Plaintiff by diverting funds paid them to other than principal, interest and escrows thereby profiting from such conduct and placing the Plaintiff in jeopardy of failing to perform under their plan.

Unfair Conduct.

100.    Conduct is unfair under Section 17200 when it offends an established public policy that is "*tethered to specific constitutional, statutory, or regulatory provisions.*" Bardin v. Daimler Chrysler Corp., 136 Cal. App. 4th 1255, 1261 (2006).

101.    It is the public policy that debtors who filed bankruptcy are entitled to a fresh start.  The acts of SHELLPOINT as stated above all violate the established public policy of a fresh start.

Allegations

102.    Each of the acts and practices of SHELLPOINT stated above are "unfair" within the meaning of California Business and Professions Code section 17200.

103.    Each of the acts and practices of SHELLPOINT stated above are "unlawful" within the meaning of California Business and Professions Code section 17200 because they violate Federal Bankruptcy Law.

104.    As a direct consequence of the Defendants' unlawful and unfair business practices, have made it difficult for the Plaintiff to complete their plan of reorganization and further have taken funds of a bankrupt Plaintiff and diverted it for their own use causes further financial harm to a debtor susceptible to substantial financial harm.

105.    Plaintiff requests an injunction, as authorized by Business and Professions Code section 17203 enjoining Defendants, their successors, agents, representatives, employees and all persons acting in concert with them, from engaging in acts and practices that are in violation of Business and Professions Code section 17200, including but not limited to the types of acts and practices alleged herein.

106.    Plaintiff requests an order directing Defendants to pay restitution in an amount according to proof, as authorized by Business and Professions Code section 17203, for violations of Business and Professions Code section 17200 et seq.

107.    Plaintiff requests an order directing Defendants to disgorge all monies, including any profits, they gained as a result of their violations of Business and Professions Code section 17200 et seq.

**VI. SIXTH CLAIM FOR RELIEF**
**ATTORNEY'S FEES**

108.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

109.    Effective December 1, 2014, Plaintiff is no longer required to plead attorney's fees as a separate claim for relief. However, in order to maintain consistency with the court holdings in this district, Plaintiff is pleading attorney's fees as a separate claim for relief for clarity.

110.    Plaintiff is entitled to attorney's fees pursuant to 11 U.S.C. § 362(k).

111.    Plaintiff is entitled to attorney's fees pursuant to the terms of the contract between parties, a

**COMPLAINT FOR DECLARATORY RELIEF, VIOLATION OF THE AUTOMATIC STAY AND**
**RELATED STATE AND FEDERAL CAUSES OF ACTION**

-14-

1    copy of the contract is attached as Exhibit A in the Proof of Claim.

2    112.    Attorney's fees under the contract are applicable under California Civil Code §1717, a

3    reciprocal contractual attorneys' fees statute, the Plaintiff is entitled to reimbursement of attorney's

4    fees.

5    113.    WHEREFORE, Plaintiffs request an award of reasonable attorney's fees pursuant to 11 U.S.C.

6    § 362(k) and pursuant to the terms of the contract between the parties.

7                        **VII. REQUEST FOR JUDGMENTS AND ORDERS**

8    114.    Based on the foregoing, Plaintiff requests that the Court enter a final judgment which:

9          a.    Declares SHELLPOINT guilty of violating the automatic stay;

10         b.    Awarding Plaintiff compensatory damages, punitive damages, and costs pursuant to 11

11               U.S.C. § 362(k);

12         c.    Sustain the objection to the Proof of Claim and related amendments and give SHELLPOINT

13               30 days from the date of such order to amend its claim;

14         d.    To provide the Plaintiff with amended IRS tax forms 1098's from the date of filing to date;

15         e.    For all costs associated with amending and filing amended tax returns with the corrected

16               information in the 1098 and related penalties and fees associated therein;

17         f.    For Declaratory Relief which includes a full and accurate accounting to the Court of which

18               the Court has made a determination of the correct amounts due and owing pre-petition and

19               post-petition consistent with the orders of this Court related to the plan and the court agreed

20               undisputed proof of claim and Notice of Mortgage Payment Change filed or to be filed by

21               SHELLPOINT;

22         g.    Actual money damages for improper conversion;

23         h.    An injunction, as authorized by Business and Professions Code section 17203 enjoining

24               Defendants, their successors, agents, representatives, employees and all persons acting in

25               concert with them, from engaging in acts and practices that are in violation of Business and

26               Professions Code section 17200, including but not limited to the types of acts and practices

27               alleged herein.

28

1     i.   An order directing Defendants to pay restitution in an amount according to proof, as

2         authorized by Business and Professions Code section 17203, for violations of Business and

3         Professions Code section 17200 et seq.

4     j.   An order directing Defendants to disgorge all monies, including any profits, they gained as a

5         result of their violations of Business and Professions Code section 17200 et seq..

6     k.   Punitive Damages;

7     l.   Attorney's fees and costs as allowed for in the contract between Plaintiff and Defendant and

8         pursuant to 11 U.S.C. § 362(k);

9     m.   For such other and further relief as the Court deems just and proper.

10 Dated:  3 | 20 | 2017          **FRALEY & FRALEY**

Gary Ray Fraley, Attorney for
Michael Angelo Furrace

# Exhibits

| Exhibit | Description |
|---------|-------------|
| A | Proof of Claim |
| B | Docket Report |
| C | Confirmed Plan |
| D | Spreadsheet analyzing balances from Proof of Claim - Pre Petition |
| E | Spreadsheet analyzing balances from Proof of Claim - Post Petition |
| F | SHELLPOINT Statement |
| G | Notice of Mortgage Payment Change |
| H | Statement from Shellpoint with inspection fees |
| I | Administrative Settlement of Wells Fargo |

# EXHIBIT A

B10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT | Eastern District of California | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor: Michael Angelo Farrace | Case Number: 13-24657 |
|---|---|

MAY 2 8 2013

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
CitiMortgage, Inc.

**COURT USE ONLY**

Name and address where notices should be sent:
CitiMortgage, Inc
P.O. Box 6030
Sioux Falls, SD 57117-6030
Telephone number: 866-613-5636   email: citi.poc@citi.com

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number:_____
(*if known*)

Filed on:_____

Name and address where payment should be sent (if different from above):
CitiMortgage, Inc
P.O. Box 688971
Des Moines, IA 50368-8971
Telephone number: 866-613-5636  email: CitiAssist4Trustee@citi.com

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

1. Amount of Claim as of Date Case Filed:   $ 216,725.20

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☑ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: Mortgage Loan
(See instruction #2)

| 3. Last four digits of any number by which creditor identifies debtor: ******5322 (See instruction #3a) | 3a. Debtor may have scheduled account as: | 3b. Uniform Claim Identifier (optional): (See instruction #3b) |
|---|---|---|

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☑Real Estate ☐Motor Vehicle ☐Other
Describe: 3670 Fair Oaks, Sacramento, CA 95864

Value of Property: $ 475,000.00*

Annual Interest Rate 5.500% ☑Fixed or ☐Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:
$ 50,233.27
Basis for perfection: Security Instrument

Amount of Secured Claim: $ 216,725.20

Amount Unsecured: $_____

5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__).

Amount entitled to priority:
$_____

*Amounts are subject to adjustment on 4/01/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

B10 (Official Form 10) (04/13)        2

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.    ☐ I am the creditor's authorized agent.    ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)    ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:   Josephine E. Salmon
Title:   ATTORNEY
Company:   PITE DUNCAN, LLP
Address and telephone number (if different from notice address above):
  4375 Jutland Drive, Suite 200
  P.O. Box 17933,
  San Diego, CA 92177-0933
Telephone number: (858) 750-7600    email: jsalmon@piteduncan.com

/s/    *Josephine E. Salmon* (Signature)     SBN (206167)    05/23/2013 (Date)

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

---

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the

claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

B 10 (Attachment A) (12/11)

## Part 3. Statement of Amount Necessary to Cure Default as of the Petition Date

**Does the installment payment amount include an escrow deposit?**

☐ No

☒ Yes. Attach to the Proof of Claim form an escrow account statement prepared as of the petition date in a form consistent with applicable nonbankruptcy law

1. **Installment payments due**   Date last payment received by creditor   3/20/2012

   Number of installment payments due   (1)   15

2. **Amount of installment payments due**   15   installments   From 2/1/2012   To 4/1/2013   @   $3,113.44   =   $46,701.60

| | | |
|---|---|---|
| Total installment payments due as of the petition date | $46,701.60 | Copy total here ▶ (2) $46,701.60 |

3. **Calculation of cure amount**

| | |
|---|---|
| Add total prepetition fees, expenses, and charges | Copy total from Part 2 here ▶  +  $3,531.67 |
| Subtract total of unapplied funds (funds received but not credited to account) | –  $0.00 |
| Subtract amounts for which debtor is entitled to a refund | –  $0.00 |
| Total amount necessary to cure default as of the petition date | (3)  $50,233.27 |

Copy total onto Item 4 of Proof of Claim form

| **First Post Petition Payment** | **Total** |
|---|---|
| 5/1/2013 | $2,364.16 |

CitiMortgage, Inc services the loan on the property referenced in this Proof of Claim. In the event the automatic stay in this case is modified, this case dismisses, and/or the debtor obtains a discharge and a foreclosure action is commenced on the mortgaged property, the foreclosure will be conducted in the name of ("Noteholder"). Noteholder directly or through an agent, has possession of the promissory note. The promissory note is either made payable to Noteholder or has been duly endorsed.



Filed 03/20/17    Case 17-02040    Doc 1



CitiMortgage
P.O. Box 6244
Sioux Falls, SD 57117-6243
Customer Service 1-800-283-7918
TTY Services available: Dial 711 from the United States;
Dial 1-866-280-2050 from Puerto Rico

©2011 CitiMortgage, Inc. CitiMortgage, Inc. does business as Citicorp Mortgage in NM. CitiMortgage, Inc. is an equal housing lender. Citi, Arc Design and Citi and Arc Design are registered service marks of Citigroup Inc.

Page 1

REPRESENTATION OF PRINTED DOCUMENT

**Referral Escrow Analysis**

MICHAEL FARRACE
5024 12TH AVE
SACRAMENTO CA 95820-2224

Account Number:
Analysis Date:    April 22, 2013

CASE#: 13-24657

**Mortgage Payment**

| New Monthly Payment Amount: | $2,364.16 | New Payment Effective: | May 01, 2013 |
| --- | --- | --- | --- |

**Projections for the coming Year**

Please keep this statement for reference next year.

| MONTH | PAYMENTS TO ESCROW ACCT | PAYMENTS FROM ESCROW ACCT | DESCRIPTION | PROJECTED BALANCE | REQUIRED BALANCE |
| --- | --- | --- | --- | --- | --- |
| Starting Balance (Activity Assumed through April, 2013) | | | | $4,029.28 | $1,376.17 |
| MAY 13 | 458.71 | .00 | | 4,487.99 | 1,834.88 |
| JUN 13 | 458.71 | .00 | | 4,946.70 | 2,293.59 |
| JUL 13 | 458.71 | .00 | | 5,405.41 | 2,752.30 |
| AUG 13 | 458.71 | .00 | | 5,864.12 | 3,211.01 |
| SEP 13 | 458.71 | .00 | | 6,322.83 | 3,669.72 |
| OCT 13 | 458.71 | .00 | | 6,781.54 | 4,128.43 |
| NOV 13 | 458.71 | 2,752.28 | COUNTY TAX | 4,487.97 | 1,834.86 |
| DEC 13 | 458.71 | .00 | | 4,946.68 | 2,293.57 |
| JAN 14 | 458.71 | .00 | | 5,405.39 | 2,752.28 |
| FEB 14 | 458.71 | .00 | | 5,864.10 | 3,210.99 |
| MAR 14 | 458.71 | 2,752.28 | COUNTY TAX | 3,570.53 (a) | 917.42 (b) |
| APR 14 | 458.71 | .00 | | 4,029.24 | 1,376.13 |
| TOTALS: | $5,504.52 | $5,504.56 | | | |

671-2246-011F

• Mortgage Insurance, if any, is not included in the required low point calculation.

**Determining Your Escrow Shortage/Surplus**



**CitiMortgage, Inc. appreciates your business.**

Filed 03/20/17          Case 17-02040                                                    Doc 1



| SOEID | Loan # | Doc Type |
|-------|--------|----------|
| AB62462 | | ANT |



Batch Code 2          Created: 07/16/07          Modified: 05/10/12          Printed: 05/10/12



LOAN #:

# NOTE

APRIL 22, 2003                        TARZANA,                        CALIFORNIA
[Date]                                [City]                          [State]

. 3670 FAIR OAKS, SACRAMENTO, CA 95864
[Property Address]

**1. BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S.    $277,000.00   (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is   ABN AMRO MORTGAGE GROUP, INC., A DELAWARE
CORPORATION.

I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who
is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a
yearly rate of   5.500%.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section
6(B) of this Note.

**3. PAYMENTS**
(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payment on the   1ST   day of each month beginning on   JUNE 1, 2003.
I will make these payments every month until I have paid all of the principal and interest and any other charges described
below that I owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be
applied to interest before Principal. If, on   MAY 1, 2023,   I still owe amounts under this Note, I will
pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at
4242 N. HARLEM AVE.
NORRIDGE, IL 60706
ATTN: CASHIERING
or at a different place if required by the Note Holder.
(B) Amount of Monthly Payments
My monthly payment will be in the amount of U.S.   $1,905.45.

**4. BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known
as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate
a payment as a Prepayment if I have not made all the monthly payments due under the Note.
I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will
use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply
my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to
reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in
the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5. LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest
or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any
such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any
sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose
to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund
reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**
(A) Late Charge for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar
days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000%
of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
(C) Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount
by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been
paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice
is mailed to me or delivered by other means.
(D) No Waiver By Note Holder
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described
above, the Note Holder will still have the right to do so if I am in default at a later time.

Initials: ___

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3200 1/01
F3200NOT 0208



Sacramento County Recording
Mark Norris, Clerk/Recorder
BOOK **20030509** PAGE **0658**
Friday, MAY 09, 2003  9:08:57 AM
Ttl Pd   $45.00

JRQ/19/1-13

When recorded mail to:
ABN AMRO MORTGAGE GROUP, INC.
P.O. BOX 5064
TROY, MICHIGAN 48084
ATTN:FINAL/TRAILING DOCUMENTS

LOAN ─────────────────── [Space Above This Line For Recording Data] ───────────────────

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated APRIL 22, 2003,           together with all Riders to this document.

(B) "Borrower" is MICHAEL FARRACE, //////////////// A Married Man as His Sole and Separate Property

Borrower is the trustor under this Security Instrument.

(C) "Lender" is ABN AMRO MORTGAGE GROUP, INC.

CALIFORNIA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3005 1/01
Page 1 of 12

Initials:
CAUDEED        CAUDEDL  0211



LOAN #:

Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the  COUNTY                                                  [Type of Recording Jurisdiction]
of                                                    [Name of Recording Jurisdiction]:
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of  3670 FAIR OAKS, SACRAMENTO,

California      95864          ("Property Address"):                                        [Street] [City]
             [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer..
    Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3005 1/01          Initials: _UO_
                              Page 3 of 12                                                              CAUDEDL



LOAN #:

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken



Filed 03/20/17

LOAN #:

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)** Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

**(b)** Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an

**CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3005 1/01**
**Page 7 of 12**

Initials: 
CAUDEDL



LOAN #:

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay

CALIFORNIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3005 1/01
Initials: 
CAUDEDL



LOAN # :

residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

Initials: _____

CAUDEDL



# EXHIBIT "ONE"

All that portion of Section 60, as shown on the "Map of Survey and Subdivision of the Rancho Del Paso", recorded March 4, 1911, in Book A of Surveys, Map No. 94, records of said County, described as follows:

Beginning at a point in the center line of the H Street Road of Fair Oaks Boulevard, which point is located North 68°21'00" East 1,403.14 feet from the one-quarter section corner in the West line of said Section 60, said one-quarter section corner being located at the Southeast corner of Lot 17, as shown on the "Plat of Oak Field", recorded in the office of the County Recorder of Sacramento County, May 6, 1913, in Book 14 of Maps, Map No. 19; said one-quarter corner also being located South 38°22'50" East 50.36 feet from the Southeast corner of Lot 38, as shown on that "Plat of Sierra Oaks Vista Unit No. 3", recorded in the office of the County Recorder of Sacramento County, October 4, 1939, in Book 21 of Maps, Map No. 22, said point of beginning also the Northeast corner of the center realty described in Deed dated November 12, 1941, recorded December 14, 1941, in Book 922 of Official Records, Page 356, executed by Edlo May Scott and Thomas J. Scott, Jr., to Earl C. Rossi and Dolly E. Rossi, his wife, as joint tenants; thence from said point of beginning along the Easterly line of said realty so conveyed Rossi and wife, South 02°17'30" West 300 feet; thence North 53°02'48" East 184.68 feet to a point on the Westerly boundary of tract of land conveyed by Deed dated January 3, 1941, recorded January 11, 1941, in Book 857 of Official Records, Page 425; executed by Thomas J. Scott, Jr., and Edlo May Scott, his wife, to Ida M. Farrell, a widow thence, along the Westerly boundary of said tract of land so conveyed to Ida M. Farrell, North 12°50'00" West 25 feet to a point in the center line of said H Street Road or Fair Oaks Boulevard, thence along the center line of said Fair Oaks Boulevard, South 68°21'00" West 89.99 feet, more or less, to the point of beginning.

Assessor's Parcel No:



2

## CERTIFICATE OF MERGER

of

### ABN AMRO MORTGAGE GROUP, INC.

into

### CITIMORTGAGE, INC.

### Under Section 904 of the Business Corporation Law

It is hereby certified, on behalf of each of the constituent corporations herein named, as follows:

FIRST: The Board of Directors of each of the constituent corporations has duly adopted an agreement and plan of merger (the "Plan of Merger") setting forth the terms and conditions of the merger of said corporations.

SECOND: The name of the domestic constituent corporation, which is to be the surviving corporation (hereinafter sometimes referred to as the "surviving constituent corporation"), is CITIMORTGAGE, INC. The name under which the surviving constituent corporation was formed is BT International Trading Corporation. The date upon which its certificate of incorporation was originally filed by the Department of State is May 7, 1984.

THIRD: The name of the foreign constituent corporation, which is being merged into the surviving constituent corporation (hereinafter sometimes referred to as the "merged constituent corporation"), is ABN AMRO MORTGAGE GROUP, INC. and the name under which it was formed is Cragin Financial Corp. The jurisdiction of its incorporation is Delaware and the date of its incorporation therein is January 3, 1991.

FOURTH: An Application for Authority in the State of New York of the merged constituent corporation to transact business as a foreign corporation was not filed with the Department of State of the State of New York.

FIFTH: As to each constituent corporation, the Plan of Merger sets forth the designation and number of outstanding shares of each class and series (which number is not subject to change), the specification of the classes and series entitled to vote on the Plan of Merger, and the specification of each class and series entitled to vote as a class on the Plan of Merger, as follows:

### CITIMORTGAGE, INC.

| Designation of each outstanding class and | Number of outstanding shares of | Designation of class and series entitled to | Classes and series entitled to vote as a |
|---|---|---|---|



IN WITNESS WHEREOF, the undersigned duly authorized officers of the surviving constituent corporation and the merged constituent corporation hereunto set their hands this 21 day of August, 2007.

CITIMORTGAGE, INC.

BY: _____
Name:  William P. Beckmann
Title:    President

ABN AMRO MORTGAGE GROUP, INC.

BY: _____
Name:  William P. Beckmann
Title:    President

Robert P. Zahradka (SBN 282706)
rzahradka@piteduncan.com
Philip J. Giles (SBN 272582)
PGiles@piteduncan.com
**PITE DUNCAN, LLP**
4375 Jutland Drive, Suite 200
P.O. Box 17933
San Diego, CA 92177-0933
Telephone: (858) 750-7600
Facsimile: (619) 590-1385

Attorneys for Movant CitiMortgage, Inc.

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO

| | |
|---|---|
| In re | Chapter 13 |
| MICHAEL ANGELO FARRACE, | Case No. 13-24657 |
| Debtor. | D.C. No. PD-1 |
| | **CERTIFICATE OF SERVICE** |

I, Julio A. Contreras, hereby certify that:

I am over the age of 18 and not a party to this proceeding. My business address is 4375 Jutland Drive, Suite 200; P.O. Box 17933, San Diego, CA 92177-0933.

On May 23, 2013, a copy of the following documents:

- Proof of Claim

was served by placing a copy thereof enclosed in a sealed envelope in the United States Mail, first class, postage prepaid, and/or by sending copies via e-mail pursuant to Local Bankruptcy Rule 7005-1(d)(1) to parties consenting to service by electronic means, as follows:

| **U.S. MAIL (FIRST CLASS)** |
|---|
| Michael Angelo Farrace |
| 5024 12th Ave |
| Sacramento, CA 95820 |
| |



# EXHIBIT B

DebtEd

**U.S. Bankruptcy Court**
**Eastern District of California (Sacramento)**
**Bankruptcy Petition #: 13-24657**

*Assigned to:* Hon. Ronald H. Sargis
Chapter 13
Voluntary
Asset

*Date filed:* 04/04/2013
*Plan confirmed:* 06/11/2013
*341 meeting:* 05/16/2013
*Deadline for filing claims (govt.):* 10/01/2013

*Debtor*
**Michael Angelo Farrace**
2340 Skube Ln
Sacramento, CA 95825
SACRAMENTO-CA
SSN / ITIN: xxx-xx-9376

represented by Gary Ray Fraley
1401 El Camino Ave #370
Sacramento, CA 95815-2747
(916) 485-5444

*Trustee*
**David Cusick**
PO Box 1858
Sacramento, CA 95812-1858
916-856-8000

*U.S. Trustee*
**Office of the U.S. Trustee**
Robert T Matsui United States Courthouse
501 I Street, Room 7-500
Sacramento, CA 95814

| Filing Date | # | Docket Text |
|---|---|---|
| 04/04/2013 | | Case participants added via Case Upload. (Entered: 04/05/2013) |
| 04/04/2013 | 1 | Chapter 13 Voluntary Petition. All Schedules and Statements filed. (Entered: 04/05/2013) |
| 04/04/2013 | 3 | Master Address List (auto) (Entered: 04/05/2013) |
| 04/04/2013 | 4 | Statement of Social Security Number(s) (lars) (Entered: 04/05/2013) |
| 04/04/2013 | 5 | Chapter 13 Plan (auto) (Entered: 04/05/2013) |
| 04/04/2013 | 7 | Rights and Responsibilities of Chapter 13 Debtors and their Attorneys (auto) (Entered: 04/05/2013) |
| 04/04/2013 | | Chapter 13 Voluntary Petition (Filing Fee Paid: $281.00, Receipt Number: 2-13-06831) (auto) (Entered: 04/05/2013) |
| 04/05/2013 | 2 (1 pg) | Designation of Trustee (auto) (Entered: 04/05/2013) |
| 04/05/2013 | 6 (1 pg) | Order Re: Chapter 13 Plan Payments, Adequate Protection Payments, and Employer Payment Advices (lars) (Entered: 04/05/2013) |
| 04/09/2013 | 8 (6 pgs) | Copy of Chapter 13 Plan as transmitted to BNC for service. (LeMaster, Billie) (Entered: 04/09/2013) |
| 04/09/2013 | 9 (2 pgs) | Notice of Commencement of Case Under Chapter 13, Meeting of Creditors and Deadlines as transmitted to BNC for service. Meeting of Creditors to be held on 5/16/2013 at 09:00 AM at Meeting Room 7-A. Proofs of Claim due by 8/14/2013. (LeMaster, Billie) (Entered: 04/09/2013) |
| 04/09/2013 | 11 (4 pgs) | Certificate of Mailing of Chapter 13 Meeting Notice as provided by the Bankruptcy Noticing Center (Admin.) (Entered: 04/11/2013) |

| | | |
|---|---|---|
| 04/09/2013 | 12 (8 pgs) | Certificate of Mailing of Copy of Chapter 13 Plan as provided by the Bankruptcy Noticing Center (Admin.) (Entered: 04/11/2013) |
| 04/10/2013 | 10 (2 pgs) | Notice of Requirement to Complete Course in Financial Management Course Certificate as Transmitted to BNC for Service. (Admin) (Entered: 04/10/2013) |
| 04/10/2013 | 13 (4 pgs) | Certificate of Mailing of Notice of Requirement to File a Statement of Completion of Course in Personal Financial Management as provided by the Bankruptcy Noticing Center (Admin.) (Entered: 04/12/2013) |
| 05/20/2013 | | Report of Trustee at 341 Meeting. The 341 Meeting was held on 5-16-13. Debtor Appeared; Counsel Appeared; 341 Meeting Concluded as to Debtor. (Stewart, Kari) (Entered: 05/20/2013) |
| 06/11/2013 | 14 | Order Confirming Chapter 13 Plan. (stps) (Entered: 06/11/2013) |
| 06/18/2013 | 15 | Request for Special Notice Filed by Creditor CITIMORTGAGE, INC. (stps) (Entered: 06/18/2013) |
| 06/27/2013 | doc | Notice of Mortgage Payment Change with Certificate of Service Filed by Creditor CitiMortgage, Inc. (stps) (Entered: 06/27/2013) |
| 09/06/2013 | 16 (2 pgs) | Notice of Late Filed Claim (shbs) (Entered: 09/06/2013) |
| 09/06/2013 | 16 (2 pgs) | Notice of Intent to Pay (shbs) (Entered: 09/06/2013) |
| 09/06/2013 | 17 (2 pgs) | Certificate/Proof of Service of 16 Notice of Late Filed Claim, 16 Notice of Intent to Pay (shbs) (Entered: 09/06/2013) |
| 11/18/2013 | 18 (7 pgs) | Notice of Filed Claims Filed by Chapter 13 Trustee. (Hughes, Anne) (Entered: 11/18/2013) |
| 11/18/2013 | 19 (2 pgs) | Certificate of Service of Notice of Filed Claims. (Hughes, Anne) (Entered: 11/18/2013) |
| 01/27/2014 | doc (5 pgs) | Notice of Mortgage Payment Change with Certificate of Service Filed by Creditor CitiMortgage, Inc. (fdis) (Entered: 01/27/2014) |
| 01/28/2015 | doc (5 pgs) | Notice of Mortgage Payment Change with Certificate of Service Filed by Creditor CitiMortgage, Inc. (lars) (Entered: 01/28/2015) |
| 02/29/2016 | 20 (2 pgs) | Assignment/Transfer of Claim from CitiMortgage, Inc to Shellpoint Mortgage Servicing (Fee Paid $25) (eFilingID: 5740373) (smis) (Entered: 02/29/2016) |
| 02/29/2016 | | Transfer Of Claim Fee Paid ($25.00, Receipt Number: 58896, eFilingID: 5740373) (auto) (Entered: 02/29/2016) |
| 02/29/2016 | 21 (1 pg) | Notice of Intent to Transfer Claim From Transferor: CitiMortgage, Inc (Claim No. 3); Transferor: CitiMortgage, Inc (Claim No. 4); To Shellpoint Mortgage Servicing As Submitted To BNC For Service. (smis) (Entered: 02/29/2016) |
| 02/29/2016 | 22 (2 pgs) | Certificate of Mailing of Notice of Intent to Transfer Claim as provided by the Bankruptcy Noticing Center (Admin.) (Entered: 03/02/2016) |
| 11/29/2016 | 23 (1 pg) | Change of Address for Debtor Michael Angelo Farrace (jlns) (Entered: 11/29/2016) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/19/2017 19:18:00 | | |
| PACER Login: | fraleypc:2548639:0 | Client Code: |

| Description: | Docket Report | Search Criteria: | 13-24657 Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Headers: included Format: html Page counts for documents: included |
|---|---|---|---|
| Billable Pages: | 2 | Cost: | 0.20 |

.

# EXHIBIT C

Gary Ray Fraley – SBN 80056
FRALEY & FRALEY BANKRUPTCY ATTORNEYS
1401 El Camino Ave
Suite #370
Sacramento, CA 95815
Ph: (916) 485-5444

Attorney for Michael Angelo Farrace

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

In Re:                                    Case No. 2013-24657

Michael Angelo Farrace

                                 Debtor

## ORDER CONFIRMING PLAN

The Chapter 13 Plan filed on April 4, 2013 of the above-name Debtor(s) has been transmitted to all creditors, and it has been determined after notice and opportunity for a hearing that the Debtor(s) plan satisfies the requirements of 11 U.S.C. §1325.

Therefore, **IT IS ORDERED** that the Plan is confirmed.

**IT IS FURTHER ORDERED** that:

1. The Debtor shall immediately notify, in writing, the Clerk of the United States Bankruptcy Court and the Trustee, of any change in the Debtors' address;

2. The Debtor shall immediately notify the Trustee in writing of any termination, reduction of or other change in the employment of the Debtor; and

3. The Debtor shall appear in Court whenever notified to do so by the Court.

RECEIVED
June 10, 2013
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0004838003

**IT IS FURTHER ORDERED** that the Attorney's fees for the Debtors' Attorney in the full amount of $5,000.00 are approved, $5,000.00 of which was paid prior to the filing of the petition. The balance of $0.00, provided that the Attorney and the Debtor have executed have complied with the Local Bankruptcy Rule 2016-1 (c), shall be paid by the Trustee from plan payments at the rate specified in the confirmed plan.

6-3-13

Approved by the Chapter 13
Trustee as to form.

Dated: June 11, 2013

By the Court

Ronald H. Sargis, Judge
United States Bankruptcy Court

Order Confirming Plan                    2

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA

Name of Debtor:  **Michael Angelo Farrace**                     Case No.

Last four digits of Soc. Sec. No.:  **xxx-xx-9376**
Last four digits of Soc. Sec. No.:

## CHAPTER 13 PLAN

**YOU WILL BE NOTIFIED OF THE DATE, TIME, AND LOCATION OF A HEARING TO CONFIRM THIS PLAN AND OF THE DEADLINE TO OBJECT TO ITS CONFIRMATION. IN THE ABSENCE OF A TIMELY WRITTEN OBJECTION, THE PLAN MAY BE CONFIRMED WITHOUT A HEARING. IT WILL BE EFFECTIVE UPON ITS CONFIRMATION.**

### Section 1. Plan Payments and Commitment Period

**1.01    Monthly plan payments.** To complete this plan, Debtor shall submit to the supervision and control of Trustee on a monthly basis the sum of $ __4,967.15__ from future earnings. This monthly plan payment is subject to adjustment pursuant to section 2.08(b)(4) below and it must be received by Trustee not later than the 25th day of each month beginning the month after the order for relief under chapter 13. The monthly plan payment includes all post-petition charges due on Class 1 secured claims and adequate protection payments due on Class 2 secured claims.

**1.02.    Other payments.** In addition to the submission of future earnings, Debtor will make payment(s) derived from property of the bankruptcy estate, property of Debtor, or from other sources, as follows: ____ .

**1.03.    Duration of payments.** The monthly plan payments will continue for __60__ months unless all allowed unsecured claims are paid in full within a shorter period of time. If necessary to complete the plan, monthly payments may continue for an additional 6 months, but in no event shall monthly payments continue for more than 60 months.

### Section 2. Claims and Expenses

#### A. Proofs of Claim

**2.01.    ** With the exception of the payments required by sections 2.02, 2.03, 2.11, and 3.01, a claim will not be paid pursuant to this plan unless a timely proof of claim is filed by or on behalf of a creditor, including a secured creditor.

**2.02.    ** Monthly contract installments and other charges falling due after the filing of the case shall be paid to Class 1 and 4 claim holders and to the nondebtor party to assumed executory contracts/unexpired leases whether or not the plan is confirmed or proofs of claim have been filed.

**2.03.    ** Post-petition amounts due on account of a domestic support obligation, a loan from retirement or thrift savings plan, or an executory contract/unexpired lease being assumed, shall be paid by Debtor directly to the person entitled to such payments whether or not the plan is confirmed or a proof of claim has been filed.

**2.04.    ** The proof of claim, not this plan or the schedules, shall determine the amount and classification of a claim unless the court's disposition of a claim objection, valuation motion, or lien avoidance motion affects the amount or classification of the claim.

#### B. Administrative Expenses

**2.05.    Trustee's fees.** Pursuant to 28 U.S.C. § 586(e), Trustee shall receive up to 10% of plan payments, whether made before or after confirmation, but excluding direct payments on Class 4 claims.

**2.06.    Debtor's attorney's fees.** Debtor's attorney of record was paid $ __5,000.00__ prior to the filing of the case. Subject to prior court approval, additional fees of $ __0.00__ shall be paid through this plan. Debtors' attorney will seek the court's approval by [*choose one*]: ■ complying with Local Bankruptcy Rule 2016-1(c); or ☐ filing and serving a

motion in accordance with 11 U.S.C. §§ 329 and 330, Fed. R. Bankr. P. 2002, 2016, and 2017.

2.07.   **Administrative expenses.** In accordance with sections 4.02 and 4.03 below, $0.00 of each monthly plan payment shall be paid on account of: (a) compensation due a former chapter 7 trustee; (b) approved administrative expenses; and (c) approved additional attorney's fees. Approved administrative expenses shall be paid in full through this plan except to the extent a claimant agrees otherwise or 11 U.S.C. § 1326(b)(3)(B) is applicable.

C. Secured Claims

2.08.   **Class 1 includes all delinquent secured claims that mature after the completion of this plan.**

(a) **Cure of arrears.** All arrears on Class 1 claims shall be paid in full by Trustee. The cure will be paid in the equal monthly installments specified in the table below as the "arrearage dividend."

(1) The cure shall include interest unless a "0%" rate is specified below. If the provision for interest is left blank, interest will accrue at the rate of 10%.

(2) The arrearage dividend must be applied by the Class I creditor to the arrears. If this plan provides for interest on the arrears, the arrearage dividend shall be applied first to such interest, then to the arrears.

(b) **Post-petition charges.** Trustee shall maintain all payments falling due after the filing of the case to the holder of each Class 1 claim.

(1) If Debtor makes a partial plan payment that is insufficient to satisfy such post-petition payments, distributions will be made in the order such claims are listed below.

(2) Trustee will not make a partial distribution on account of a post-petition payment.

(3) If Debtor makes a partial plan payment, or if it is not paid on time, and Trustee is unable to make timely a post-petition payment, Debtor's cure of this default shall include any late charge.

(4) The automatic stay is modified to permit the holders of Class 1 claims to send statements, impound, and escrow notices, and notices concerning interest rate adjustments or the assessment of fees and costs to Debtor. However, Trustee will not make post-petition payment adjustments or pay post-petition fees, charges, or assessments until they are demanded in accordance with Fed. R. Bankr. P. 3002.1.

(i) If the holder of a Class 1 claim gives Debtor and Trustee notice of a payment change in accordance with Fed. R. Bankr. P. 3002.1(b), Debtor shall adjust the plan payment accordingly.

(ii) If the holder of a Class 1 claim gives Debtor and Trustee notice of post-petition fees, expenses, and charges in accordance with Fed. R. Bankr. P. 3002.1(c), Debtor shall modify this plan if Debtor wishes to provide for such fees, expenses, and charges.

(5) Post-petition payments made by Trustee and received by the holder of a Class 1 claim shall be applied as if the claim were current and no arrearage existed on the date the case was filed.

(c) **No claim modification.** Each Class 1 creditor shall retain its lien. Other than to cure of any arrearage, this plan does not modify Class 1 claims.

| Class 1 Creditor's Name/<br>Collateral Description | Amount of Arrears | Interest Rate on Arrears | Arrearage Dividend | Monthly Contract Installment Amount |
|---|---|---|---|---|
| 1. CitiMortgage / Rental: Single Family Dwelling With Cottage<br>Location: 3670 Fair Oaks Blvd<br>Sacramento, CA  95864 | 42,192.94 | 0.00% | 740.23 | 2,364.16 |
| 2. Wells Fargo Bank, N.A. / Rental: Single Family Dwelling With Cottage<br>Location: 3670 Fair Oaks Blvd<br>Sacramento, CA  95864 | 15,404.00 | 0.00% | 270.25 | 1,153.00 |
|  | | | Totals: $1,010.48 | $3,517.16 |

**2.09.    Class 2 includes all secured claims that are modified by this plan, or that have matured or will mature before the plan is completed.**

**(a) Payment of claim.** Trustee shall pay each Class 2 claim the equal monthly amount specified below as the monthly dividend. Subject to section 2.09(c), Class 2 claims will be paid in full. The payment of a Class 2 claim shall include interest unless a "0%" rate is specified below. If no rate is specified, a 10% rate will be imputed.

**(b) Adequate protection payments.** Prior to confirmation, Trustee shall pay on account of each allowed Class 2 claim secured by a purchase money security interest in personal property an adequate protection payment if required by section 1326(a)(1)(C). The adequate protection payment shall equal the monthly dividend. Adequate protection payments shall be disbursed by Trustee in connection with his customary month-end disbursement cycle beginning the month after the case was filed. If a Class 2 claimant is paid an adequate protection payment, that claimant shall not be paid a monthly dividend for the same month.

**(c) Claim amount.** The amount of a Class 2 claim is determined by applicable nonbankruptcy law. However, subject to the two limitations below, Debtor may reduce the claim to the value of the collateral securing it by filing, serving, setting for hearing, and prevailing on a motion to determine the value of that collateral. If this plan proposes to reduce a claim based upon the value of its collateral, the failure to move to value that collateral in conjunction with plan confirmation may result in the denial of confirmation.

(1) Debtor is prohibited from reducing a claim if the claim holder has a purchase money security interest and the claim either was incurred within 910 days of the filing of the case and is secured by a motor vehicle acquired for the personal use of Debtor, or was incurred within 1-year of the filing of the case and is secured by any other thing of value.

(2) Debtor is prohibited from modifying the rights of a holder of a claim secured only by a security interest in real property that is Debtor's principal residence.

**(d) Lien retention.** Each Class 2 creditor shall retain its existing lien until completion of the plan and, unless not required by Bankruptcy Court, entry of Debtor's discharge.

| Class 2 Creditor's Name and description of collateral | Purchase Money Security Interest personal property? YES/NO | Amount claimed by creditor | Value of creditor's interest in its collateral | Interest Rate | Monthly Dividend |
|---|---|---|---|---|---|
| A. Class 2 claims not reduced based on value of collateral | | | | | |
| 1. Sacramento County Utilities / Rental: Single Family Dwelling With Cottage Location: 3670 Fair Oaks Blvd Sacramento, CA 95864 | N | 984.09 | | 4.50% | 19.27 |
| A. Class 2 claims not reduced based on value of collateral | | | | | |
| 2. Westlake Financial / Auto: 2002 Toyota 4 Runner 2WD Location: 5024 12th Ave. Sacramento, CA 95820 VIN#JT3GN86R820221440 Mileage 167,120 Condition Good | Y | 6,200.00 | | 4.50% | 121.43 |
| B. Class 2 claims reduced based on value of collateral | | | | | |
| -NONE- | | | | | |
| C. Class 2 claims reduced to $0  based on value of collateral | | | | | |
| -NONE- | | | | | |
| | | | | | Total $140.70 |

**2.10.** **Class 3 includes all secured claims satisfied by the surrender of collateral.** Upon confirmation of the plan, all bankruptcy stays are modified to allow a Class 3 secured claim holder to exercise its rights against its collateral.

| Class 3 Creditor's Name/Collateral Description | Estimated Deficiency | Is Deficiency a Priority Claim? YES/NO |
|---|---|---|
| -NONE- | | |

**2.11.** **Class 4 includes all secured claims paid directly by Debtor or third party.** Class 4 claims mature after the completion of this plan, are not in default, and are not modified by this plan. These claims shall be paid by Debtor or a third person whether or not the plan is confirmed. Upon confirmation of the plan, all bankruptcy stays are modified to allow the holder of a Class 4 secured claim to exercise its rights against its collateral and any nondebtor in the event of a default under applicable law or contract.

| Class 4 Creditor's Name/Collateral Description | Monthly Contract Installment | Person Making Payment |
|---|---|---|
| -NONE- | | |

**2.12.** **Secured claims not listed as Class 1, 2, 3, or 4 claims are not provided for by this plan.** The failure to provide for a secured claim in one of these classes may be cause to terminate the automatic stay.

D. Unsecured Claims

**2.13.** **Class 5 consists of unsecured claims entitled to priority pursuant to 11 U.S.C. § 507.** These claims will be paid in full except to the extent the claim holder has agreed to accept less or 11 U.S.C. § 1322(a)(4) is applicable. When section 1322(a)(4) is applicable to a claim, the claim holder and the treatment of the claim shall be specified in the Additional Provisions. The failure to provide the foregoing treatment for a priority claim is a breach of this plan.

| Class 5 Creditor's Name | Type of Priority | Claim Amount |
|---|---|---|
| 1. Internal Revenue Service | Taxes and certain other debts | 3,500.00 |

**2.14.** **Class 6 includes designated unsecured claims, such as co-signed unsecured debts, that will be paid in full even though all other nonpriority unsecured claims may not be paid in full.**

| Class 6 Creditor's Name | Reason for Special Treatment | Claim Amount |
|---|---|---|
| -NONE- | | |

**2.15.** **Class 7 consists of all other unsecured claims** not listed as Class 5 or 6 claims. These claims will receive no less than a __100__ % dividend. These claims, including the under-collateralized portion of secured claims not entitled to priority, total $ __0.00__ .

### Section 3. Executory Contracts And Unexpired Leases

**3.01.** Debtor assumes the executory contracts and unexpired leases listed below. Debtor shall pay directly to the other party to the executory contract or unexpired lease, before and after confirmation, all post-petition payments. Unless a different treatment is required by 11 U.S.C. § 365(b)(1) and is set out in the Additional Provisions, pre-petition arrears shall be paid in full. The monthly dividend payable on account of those arrears is specified in the table below.

**3.02.** Any executory contract or unexpired lease not listed in the table below is rejected. Upon confirmation of the plan, all bankruptcy stays are modified to allow the nondebtor party to an unexpired lease to obtain possession of leased property, to dispose of it under applicable law, and to exercise its rights against any nondebtor in the event of a default under applicable law or contract.

| Name of Other Party to Executory Contract/Unexpired Lease | Regular Payment | Pre-petition Arrears | Arrearage Dividend |
|---|---|---|---|
| -NONE- | | | |
| | | Total $0.00 | |

### Section 4. Payment of Claims and Order of Payment

4.01.    After confirmation, payments to holders of allowed claims and approved expenses will be made monthly.

4.02.    **Distribution of plan payment.** Debtor's monthly plan payment must total: (a) Trustee's fees; (b) post-petition payments due on Class 1 claims; (c) the monthly dividend specified in section 2.07 for administrative expenses; and (d) the monthly dividends payable on account of Class 1 arrearage claims, Class 2 claims and executory contract and unexpired lease arrearage claims. To the extent plan payments are not needed to pay the foregoing dividends, they shall be paid pro rata, first to Class 5 priority claims, second to Class 6 unsecured claims, and third to Class 7 unsecured claims. Over the plan's duration, these distributions must equal the total dividends required by sections 2.05, 2.07, 2.08, 2.09, 2.13, 2.14, and 2.15.

4.03.    **Priority of payment among administrative expenses.** The portion of the monthly plan payment allocated in section 2.07 for administrative expenses, shall be distributed first to any former chapter 7 trustee up to the monthly amount required by section 1326(b)(3)B), and second to holders of approved administrative expenses on a pro rata basis.

## Section 5. Miscellaneous Provisions

5.01.    **Vesting of property.** Any property of the estate [choose one] shall ■ shall not ☐ revest in Debtor upon confirmation of the plan. In the event the case is converted to a case under Chapter 7, 11, or 12 of the Bankruptcy Code or is dismissed, the property of the estate shall be determined in accordance with applicable law.

5.02.    **Debtor's duties.** In addition to the duties imposed upon Debtor by the Bankruptcy Code, the Bankruptcy Rules, and applicable nonbankruptcy law, the court's Local Bankruptcy Rules impose additional duties on Debtor, including without limitation, obtaining prior court authorization prior to transferring property or incurring additional debt, maintaining insurance, providing Trustee copies of tax returns, W-2 forms, 1099 forms, and quarterly financial information regarding Debtor's business or financial affairs, and providing Trustee not later than the 14 days after the filing of the case with the Domestic Support Obligation Checklist for each domestic support obligation and a Class 1 Worksheet and Authorization to Release Information for each Class 1 claim.

5.03.    **Remedies upon default.** If Debtor defaults under this plan, or if the plan will not be completed within six months of its stated term, not to exceed 60 months, Trustee or any other party in interest may request appropriate relief by filing a motion and setting it for hearing pursuant to Local Bankruptcy Rule 9014-1. This relief may consist of, without limitation, dismissal of the case, conversion of the case to chapter 7, or relief from the automatic stay to pursue rights against collateral. If the court terminates the automatic stay to permit a Class 1 or 2 secured claim holder to proceed against its collateral, unless the court orders otherwise, Trustee shall make no further payments on account of such secured claim and any portion of such secured claim not previously satisfied under this plan shall be satisfied as a Class 3 claim. Any deficiency remaining after the creditor's disposition of its collateral shall be satisfied as a Class 7 unsecured claim subject to the timely filing of a proof of claim.

## Section 6. Additional Provisions

This plan is the court's standard plan form. Other than to insert text into designated spaces, expand tables to include additional claims, or change the title to indicate the date of the plan or that the plan is a modified plan, the preprinted text of this form has not been altered. In the event there is an alteration, it will be given no effect. The signatures below are certifications that the standard plan form has not been altered.

Despite the foregoing, as long as consistent with the Bankruptcy Code, Debtor may propose additional provisions that modify the preprinted text. All additional provisions shall be on a separate piece of paper appended at the end of this plan. Each additional provision shall be identified by a section number beginning with section 6.01and indicate which section(s) of the standard plan form have been modified.

Additional Provisions [choose one] are ☐ are not ■ appended to this plan.

(Signature Page)

Dated: **April 3, 2013**



**Michael Angelo Farrace**
Debtor

Joint debtor



**Gary Ray Fraley, Esq.**
Debtor's Attorney

Dated: **April 3, 2013**

# EXHIBIT D

**Farrace Analysis -Prepetition Arrearage - Part 1**

Interest Rate:  5.5

| Date | Due | Transaction | Amount | Escrow Advance | Escrow Advance Balance | Expense Desc | Expense Amount | Expense Balance | Escrow Payment | Escrow Balance | Principal | Interest | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/4/2013 | | | | | | Late Charges | $ 285.81 | $ 285.81 | | | | | |
| 4/4/2013 | | | | | | Inspections | $ 283.50 | $ 569.31 | | | | | |
| 4/4/2013 | | | | | | Accrued Late Charges | $1,333.78 | $ 1,903.09 | | | | | |
| 4/4/2013 | | | | | | Int on Escrow Advances | $ 50.73 | $ 1,953.82 | | | | | |
| 4/4/2013 | | | | | | Foreclosure Fees | 1577.85 | $ 3,531.67 | | | | | |
| 04/04/2013 | | | $0.00 | $0.00 | $0.00 | Balance | $0.00 | $ 3,531.67 | $0.00 | $0.00 | $0.00 | $0.00 | $186,216.43 |
| 02/01/2012 | 02/01/2012 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $1,207.99 | $1,051.96 | $853.49 | $185,164.47 |
| 03/01/2012 | 03/01/2012 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $2,415.98 | $1,056.78 | $848.67 | $184,107.69 |
| 04/01/2012 | 04/01/2012 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $3,623.97 | $1,061.62 | $843.83 | $183,046.07 |
| 04/10/2012 | 04/10/2012 Property Tax | | | | | | | | ($2,564.72) | $1,059.25 | $0.00 | $0.00 | $183,046.07 |
| 05/01/2012 | 05/01/2012 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $2,267.24 | $1,066.49 | $838.96 | $181,979.58 |
| 06/01/2012 | 06/01/2012 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $3,475.23 | $1,071.38 | $834.07 | $180,908.20 |
| 07/01/2012 | 07/01/2012 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $4,683.22 | $1,076.29 | $829.16 | $179,831.92 |
| 08/01/2012 | 08/01/2012 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $5,891.21 | $1,081.22 | $824.23 | $178,750.70 |
| 09/01/2012 | 09/01/2012 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $7,099.20 | $1,086.18 | $819.27 | $177,664.52 |
| 10/01/2012 | 10/01/2012 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $8,307.19 | $1,091.15 | $814.30 | $176,573.37 |
| 11/01/2012 | 11/01/2012 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $9,515.18 | $1,096.16 | $809.29 | $175,477.21 |
| 12/01/2012 | 12/01/2012 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $10,723.17 | $1,101.18 | $804.27 | $174,376.03 |
| 12/10/2012 | 12/10/2012 Property Tax | | | | | | | | ($2,752.28) | $7,970.89 | $0.00 | $0.00 | $174,376.03 |
| 01/01/2013 | 01/01/2013 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $11,931.16 | $1,106.23 | $799.22 | $173,269.80 |
| 02/01/2013 | 02/01/2013 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $13,139.15 | $1,111.30 | $794.15 | $172,158.51 |
| 03/01/2013 | 03/01/2013 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $14,347.14 | $1,116.39 | $789.06 | $171,042.12 |
| 04/01/2013 | 04/01/2013 Payment Due | | $3,113.44 | $0.00 | $0.00 | | $0.00 | $3,531.67 | $1,207.99 | $15,555.13 | $1,121.51 | $783.94 | $169,920.61 |
| Totals: | | | $46,701.60 | | | | | | | | $16,295.82 | $12,285.93 | |

Pre-Petition Payments   $46,701.60
Expenses   $3,531.67
Esc. Short.   $0.00
Total:   $50,233.27 Matches POC

Substantial disconnect related to impound account. No shortage shown on POC. However, escrow analysis included in POC shows that a shortage in April 2012 of $8,586.01 and by the date of filing, a shortage of $14,090.57. This amount is questionable as it is not listed as a shortage and does not seem to take into account pre-petition portion of payments to be accrued. A more accurate balance can be calcuated once an understanding of the shortgage due prior to the first pre-petition payment in February 2012.

**EXHIBIT E**

| Rate: | 5.5 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Due | Transaction | Amount | Principal | Interest | Balance | Desc | Expense | Exp Bal | Desc | Escrow | Esc Bal |
| 04/04/2013 | | POC | $0.00 | $0.00 | $0.00 | $169,920.61 | | $0.00 | $0.00 | 0 | $0.00 | $0.00 |
| 04/10/2013 | | Taxes | $0.00 | 0.00 | 0.00 | $169,920.61 | | | | Tax Pay | -$2,752.28 | -2,752.28 |
| 06/28/2013 | 05/01/2013 | Payment | $2,364.16 | $1,126.65 | $778.80 | $168,793.96 | | | | | $458.71 | -2,293.57 |
| 07/31/2013 | 06/01/2013 | Payment | $2,364.16 | $1,131.81 | $773.64 | $167,662.15 | | | | | $458.71 | -$1,834.86 |
| 08/30/2013 | 07/01/2013 | Payment | $2,364.16 | $1,137.00 | $768.45 | $166,525.15 | | | | | $458.71 | -$1,376.15 |
| 09/30/2013 | 08/01/2013 | Payment | $2,364.16 | $1,142.21 | $763.24 | $165,382.94 | | | | | $458.71 | -917.44 |
| 10/31/2013 | 09/01/2013 | Payment | $2,364.16 | $1,147.44 | $758.01 | $164,235.50 | | | | | $458.71 | -$458.73 |
| 11/27/2013 | 10/01/2013 | Payment | $2,364.16 | $1,152.70 | $752.75 | $163,082.80 | | | | | $458.71 | -$0.02. |
| 12/10/2013 | | Taxes | $0.00 | 0.00 | 0.00 | $163,082.80 | | | | Tax Pay | -$2,287.63 | -2,287.65 |
| 12/31/2013 | 11/01/2013 | Payment | $2,364.16 | $1,157.99 | $747.46 | $161,924.81 | | | | | $458.71 | $458.69 |
| 01/31/2014 | 12/01/2013 | Payment | $2,364.16 | $1,163.29 | $742.16. | $160,761.51 | | | | | $458.71 | -$1,828.94 |
| 02/28/2014 | 01/01/2014 | Payment | $2,364.16 | $1,168.63 | $736.82 | $159,592.89 | | | | | $458.71 | $917.40 |
| 03/31/2014 | 02/01/2014 | Payment | $2,286.72 | $1,173.98 | $731.47 | $158,418.90 | | | | | $381.27 | -$1,447.67 |
| 04/10/2014 | | Taxes | $0.00 | 0.00 | 0.00 | $158,418.90 | | | | Tax Pay | -$2,287.63 | -3,735.30 |
| 04/30/2014 | 03/01/2014 | Payment | $2,286.72 | $1,179.36 | $726.09 | $157,239.54 | | | | | $381.27 | -$3,354.03 |
| 05/30/2014 | 04/01/2014 | Payment | $2,286.72 | $1,184.77 | $720.68 | $156,054.77 | | | | | $381.27 | -$2,972.76 |
| 06/30/2014 | 05/01/2014 | Payment | $2,286.72 | $1,190.20 | $715.25 | $154,864.57 | | | | | $381.27 | -$2,591.49 |
| 07/31/2014 | 06/01/2014 | Payment | $2,286.72 | $1,195.65 | $709.80 | $153,668.92 | | | | | $381.27 | -$2,210.22 |
| 08/29/2014 | 07/01/2014 | Payment | $2,286.72 | $1,201.13 | $704.32 | $152,467.79 | | | | | $381.27 | -$1,828.95 |
| 09/30/2014 | 08/01/2014 | Payment | $2,286.72 | $1,206.64 | $698.81 | $151,261.15 | | | | | $381.27 | -$1,447.68 |
| 10/31/2014 | 09/01/2014 | Payment | $2,286.72 | $1,212.17 | $693.28 | $150,048.98 | | | | | $381.27 | -$1,066.41 |
| 11/26/2014 | 10/01/2014 | Payment | $2,286.72 | $1,217.73 | $687.72 | $148,831.25 | | | | | $381.27 | -$685.14 |
| 12/10/2014 | | Taxes | $0.00 | 0.00 | 0.00 | $148,831.25 | | | | Tax Pay | -$2,263.31 | -$2,948.45 |
| 12/30/2014 | 11/01/2014 | Payment | $2,286.72 | $1,223.31 | $682.14 | $147,607.94 | | | | | $381.27 | -$2,567.18 |
| 01/31/2015 | 12/01/2014 | Payment | $2,286.72 | $1,228.91 | $676.54 | $146,379.03 | | | | | $381.27 | -$2,567.18 |
| 02/28/2015 | 01/01/2015 | Payment | $2,286.72 | $1,234.55 | $670.90 | $145,144.48 | | | | | $381.27 | -$2,185.91 |
| 03/31/2015 | 02/01/2015 | Payment | $2,282.67 | $1,240.20 | $665.25 | $143,904.28 | | | | | $377.22 | -$2,189.96 |
| 04/10/2015 | | Taxes | $0.00 | 0.00 | 0.00 | $143,904.28 | | | | Tax Pay | -$2,263.31 | -4,453.27 |
| 04/30/2015 | 03/01/2015 | Payment | $2,282.67 | $1,245.89 | $659.56 | $142,658.39 | | | | | $377.22 | -$4,076.05 |
| 05/30/2015 | 04/01/2015 | Payment | $2,282.67 | $1,251.60 | $653.85 | $141,406.79 | | | | | $377.22 | -$3,698.83 |
| 06/30/2015 | 05/01/2015 | Payment | $2,282.67 | $1,257.34 | $648.11 | $140,149.46 | | | | | $377.22 | -$3,321.61 |
| 07/31/2015 | 06/01/2015 | Payment | $2,282.67 | $1,263.10 | $642.35 | $138,886.36 | | | | | $377.22 | -$2,944.39 |
| 08/29/2015 | 07/01/2015 | Payment | $2,282.67 | $1,268.89 | $636.56 | $137,617.47 | | | | | $377.22 | -$2,567.17 |
| 09/30/2015 | 08/01/2015 | Payment | $2,282.67 | $1,274.70 | $630.75 | $136,342.77 | | | | | $377.22 | -$2,189.95 |

| Date | Due | Transaction | Amount | Principal | Interest | Balance | Desc | Expense | Exp Bal | Desc | Escrow | Esc Bal |
|------|-----|-------------|--------|-----------|----------|---------|------|---------|---------|------|--------|---------|
| **Rate:** | **5.5** | | | | | | | | | | | |
| 10/31/2015 | 09/01/2015 | Payment | $2,282.67 | $1,280.55 | $624.90 | $135,062.22 | | | | | $377.22 | -$1,812.73 |
| 11/26/2015 | 10/01/2015 | Payment | $2,282.67 | $1,286.41 | $619.04 | $133,775.81 | | | | | $377.22 | -$1,435.51 |
| 12/10/2015 | | Taxes | $0.00 | 0.00 | 0.00 | $133,775.81 | | | | Tax Pay | -$2,310.49 | -$3,746.00 |
| 12/30/2015 | 11/01/2015 | Payment | $2,282.67 | $1,292.31 | $613.14 | $132,483.50 | | | | | $377.22 | -$3,368.78 |
| 01/31/2016 | 12/01/2015 | Payment | $2,282.67 | $1,298.23 | $607.22 | $131,185.26 | | | | | $377.22 | -$3,368.78 |
| 02/28/2016 | 01/01/2016 | Payment | $2,282.67 | $1,304.18 | $601.27 | $129,881.08 | | | | | $377.22 | -$2,991.56 |
| 03/31/2016 | 02/01/2016 | Payment | $2,282.67 | $1,310.16 | $595.29 | $128,570.92 | | | | | $377.22 | -$2,991.56 |
| 04/10/2016 | | Taxes | $0.00 | 0.00 | 0.00 | $128,570.92 | | | | Tax Pay | -$2,310.49 | -$5,302.05 |
| 04/30/2016 | 03/01/2016 | Payment | $2,282.67 | $1,316.17 | $589.28 | $127,254.75 | | | | | $377.22 | -$4,924.83 |
| 05/30/2016 | 04/01/2016 | Payment | $2,282.67 | $1,322.20 | $583.25 | $125,932.55 | | | | | $377.22 | -$4,547.61 |
| 06/30/2016 | 05/01/2016 | Payment | $2,282.67 | $1,328.26 | $577.19 | $124,604.29 | | | | | $377.22 | -$4,170.39 |
| 07/31/2016 | 06/01/2016 | Payment | $2,282.67 | $1,334.35 | $571.10 | $123,269.94 | | | | | $377.22 | -$3,793.17 |
| 08/29/2016 | 07/01/2016 | Payment | $2,282.67 | $1,340.46 | $564.99 | $121,929.48 | | | | | $377.22 | -$3,415.95 |
| 09/30/2016 | 08/01/2016 | Payment | $2,282.67 | $1,346.61 | $558.84 | $120,582.87 | | | | | $377.22 | -$3,038.73 |
| 10/31/2016 | 09/01/2016 | Payment | $2,282.67 | $1,352.78 | $552.67 | $119,230.10 | | | | | $377.22 | -$2,661.51 |
| 11/26/2016 | 10/01/2016 | Payment | $2,282.67 | $1,358.98 | $546.47 | $117,871.12 | | | | | $377.22 | -$2,284.29 |
| 12/10/2016 | | Taxes | $0.00 | 0.00 | 0.00 | $117,871.12 | | | | Tax Pay | -$2,345.99 | -$4,630.28 |
| 12/30/2016 | 11/01/2016 | Payment | $2,282.67 | $1,365.21 | $540.24 | $116,505.91 | | | | | $377.22 | -$4,253.06 |
| 01/30/2017 | 12/01/2016 | Payment | $2,282.67 | $1,371.46 | $533.99 | $115,134.45 | | | | | $377.22 | -$3,875.84 |

# EXHIBIT F

# Shellpoint
### Mortgage Servicing

**DO NOT SEND MAIL OR PAYMENTS TO THIS ADDRESS**
P.O. Box 619063 • Dallas, TX 75261-9063

5-811-01528-0014534-003-1-000-010-000-000

MICHAEL FARRACE
2340 SKUBE LN
SACRAMENTO CA 95825-6322

# MORTGAGE STATEMENT
Statement Date: 01/19/2017

| | |
|---|---|
| Account Number | 0568481405 |
| Next Payment Date | 02/01/2017 |
| **Contractual Payment Amount** | **$22,206.13** |

*If payment is received after 02/16/2017, $0.00 late fee may be assessed.*

| | |
|---|---|
| Phone: | 800-365-7107 |
| Website: | www.shellpointmtg.com |

## Explanation of Amount Due

| | |
|---|---|
| Principal | $1,384.07 |
| Interest | $521.38 |
| Escrow (Taxes and Insurance) | $501.75 |
|   Regular Monthly Payment | $2,407.20 |
| Total Fees and Charges | $0.00 |
| Overdue Payment | $19,798.93 |
|   Total Amount Due | $22,206.13 |

## Account Information

| | |
|---|---|
| Outstanding Principal | $127,254.74 |
| Interest Rate | 5.5000% |
| Prepayment Penalty | None |
| Property Address: | 3670 FAIR OAKS SACRAMENTO CA 95864 |
| Contractual Due Date: | April 1, 2016 |
| Current Escrow Balance: | $241.47 |

## Past Payments Breakdown

| | Paid Last Month | Paid Year to Date |
|---|---|---|
| Principal | $2,626.33 | $1,316.17 |
| Interest | $1,184.57 | $589.28 |
| Escrow | $905.34 | $524.07 |
| Fees/Late Charges | $0.00 | $0.00 |
| Unapplied Partial Payment | $1,351.88 | $4,378.07 |
| Total | $6,068.12 | $6,807.59 |

## Transaction Activity (12/06/2016 - 01/18/2017)

| Date | Description | Charges | Payments |
|---|---|---|---|
| 12/09/2016 | Partial Payment Unapplied* | $0.00 | $2,282.67 |
| 12/09/2016 | Partial Payment Unapplied* | $0.00 | $740.23 |
| 12/12/2016 | Partial Payment Unapplied* | $0.00 | -$2,286.72 |
| 12/12/2016 | Regular Payment - (Due 2/1/2016) | $0.00 | $2,286.72 |
| 12/27/2016 | Occ Prop Insp Disbursement | $15.00 | $0.00 |

## Important Messages

*Partial Payments: Any partial payments that you make are not applied to your mortgage, but instead are held in a separate suspense account according to applicable state law. If you pay the balance of a partial payment, the funds will be applied to your mortgage.

## Additional Messages

Please visit our website at www.shellpointmtg.com to view our Privacy Notice.

If you are a customer in bankruptcy or a customer who has received a bankruptcy discharge of this debt: please be advised that this notice is to advise you of the status of your mortgage loan. This notice constitutes neither a demand for payment nor a notice of personal liability to any recipient hereof, who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code. However, it may be a notice of possible enforcement of the lien against the collateral property, which has not been discharged in your bankruptcy.

Repayment options may be available to you. **Call 800-365-7107** to discuss payment arrangements. Failure to act on this matter may result in us exercising our legal rights as permitted by the contract and applicable state laws.

**For information about your payments, total amount due, and any additional payment history, see reverse side.**

## **Delinquency Notice**

You are late on your mortgage payments. Failure to bring your loan current may result in fees and foreclosure – the loss of your home. As of 01/19/2017, you are 293 days delinquent on your mortgage loan.

**Recent Account History**
o Payment 08/01/16: unpaid balance of $7,762.93
o Payment 09/01/16: unpaid balance of $2,407.20
o Payment 10/01/16: unpaid balance of $2,407.20
o Payment 11/01/16: unpaid balance of $2,407.20
o Payment 12/01/16: unpaid balance of $2,407.20
o Payment 01/01/17: unpaid balance of $2,407.20
o Payment 02/01/17: current payment due

o **Total: $22,206.13 due. You must pay this amount to bring your loan current.**

If You Are Experiencing Difficulty: Please refer to the back of this statement for additional messages about mortgage counseling and assistance.

---

Detach and return with payment.

# Shellpoint
### Mortgage Servicing

| | |
|---|---|
| Loan Number: | 0568481405 |
| MICHAEL FARRACE | |

Property Address:
3670 FAIR OAKS
SACRAMENTO CA 95864

SHELLPOINT MORTGAGE SERVICING
PO BOX 740039
CINCINNATI OH 45274-0039

| | |
|---|---|
| Payment Due Date | 02/01/2017 |
| Total Amount Due | $22,206.13 |

*$0.00 late fee will be charged after 02/16/2017*

Please write clearly inside space provided

| | |
|---|---|
| Payment Amount | $ |
| Additional Principal | $ |
| Late / Other Charges | $ |
| Additional Escrow | $ |
| **Total Amount Enclosed** | $ |

(Please do not send cash)

| | | | |
|---|---|---|---|
| 01/01/2017 | Int on Escrow Pmt | $0.00 | $22.32 |
| 01/10/2017 | Partial Payment Unapplied* | $0.00 | $740.23 |
| 01/10/2017 | Partial Payment Unapplied* | $0.00 | $2,282.67 |
| 01/11/2017 | Partial Payment Unapplied* | $0.00 | -$2,407.20 |
| 01/11/2017 | Regular Payment - (Due 3/1/2016) | $0.00 | $2,407.20 |

**Important Notice:** Shellpoint Mortgage Servicing is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

**Amount Due on Accounts in Foreclosure or Bankruptcy:** If your account is in foreclosure or bankruptcy the amount listed as the Amount Due may not be the full amount necessary to bring your account current. To obtain up-to-date amount due information, please contact us at the number listed on the statement.

For budget advice and credit counseling assistance please call the U.S. Department of Housing and Urban Development (HUD) at 800-569-4287 or at http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm.

Amounts paid in excess of your payment amount will first be used to satisfy any delinquency. If there are no past due amounts then excess funds paid will be posted to your principal balance. As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

Shellpoint Mortgage Servicing may assess a returned check fee consistent with the laws for your state and your loan documents on all checks returned by your financial institution. Additionally, Shellpoint may charge a fee for processing payoff requests.

Si usted no entiende el contenido de esta carta, por favor contacte a uno de nuestros representantes que hablan español al número 800-365-7107.

## Address, Phone, and Name Changes

Type of change (check all that apply)

**Please remember**
Name changes require a signature and a copy of a legal document noting the new name. Examples of legal documents are marriage licenses and divorce decrees.

____ Address    ____ Phone    ____ Name**    ____ Email Address

Your Account # _____    Social Security Number: _____

Old Borrower Name: _____    New Borrower Name: _____

Old Co-Borrower Name: _____    New Co-Borrower Name: _____

Borrower Signature: _____    Co-Borrower Signature: _____

New Mailing Address: _____

_____

_____

_____

**EXHIBIT G**

B 10S1 (Supplement 1) (12/11)

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT of CALIFORNIA (SACRAMENTO)

| | |
|---|---|
| In re  Michael Angelo Farrace | Case No. 13-24657 |
| Debtor | Chapter 13 |

## Notice of Mortgage Payment Change

**If you file a claim secured by a security interest in the debtor's principal residence provided for under the debtor's plan pursuant to § 1322(b)(5), you must use this form to give notice of any changes in the installment payment amount. File this form as a supplement to your proof of claim at least 21 days before the new payment amount is due.**    See Bankruptcy Rule 3002.1.

Name of creditor:   CitiMortgage, Inc.                    Court claim no.  (if known):  3

Last four digits   of any number
you use to identify the debtor's     5322
account:

**Date of payment change:**
Must be at least 21 days after date of this notice

**New total payment:**
Principal, interest, and escrow, if any

---

### Part 1: Escrow Account Payment Adjustment

**Will there be a change in the debtor's escrow account payment?**

     No

     X  Yes. Attach a copy of the escrow account statement prepared in a form consistent with applicable nonbankruptcy law. Describe the basis for the change. If a statement is not attached, explain why:

| | |
|---|---|
| Current escrow payment: $   1,207.99 | New escrow payment: $   458.71 |

### Part 2: Mortgage Payment Adjustment

**Will the debtor's principal and interest payment change based on an adjustment to the interest rate in the debtor's variable-rate note?**

     X  No

     Yes. Attach a copy of the rate change notice prepared in a form consistent with applicable nonbankruptcy law. If a notice is not attached, explain why:

| | |
|---|---|
| Current interest rate: | New interest rate: |
| Current principal and interest payment: $ | New principal and interest payment: $ |

### Part 3: Other Payment Change

**Will there be a change in the debtor's mortgage payment for a reason not listed above?**

     X  No

     Yes. Attach a copy of any documents describing the basis for the change, such as a repayment plan or loan modification agreement. *(Court approval may be required before the payment change can take effect. )*     Reason for change:

| | |
|---|---|
| Current mortgage payment: $ | New mortgage payment: $ |

## Part 4: Sign Here

The person completing this Notice must sign it.  Sign and print your name and your title, if any, and state your address and telephone number if different from the notice address listed on the proof of claim to which this Supplement applies

Check the appropriate box.

**X**  I am the creditor.        I am the creditor's authorized agent.  (Attach copy of power of attorney, if any.)

I declare under penalty of perjury  that the information provided in this Notice is true and correct to the best of my knowledge, information, and reasonable belief.

x /s/Timothy Patrick Kennedy                    Date  06/27/13
___
Signature

Print: Timothy  Patrick  Kennedy                Title    Bankruptcy Specialist
___
First Name        Middle Name        Last Name

Company  CitiMortgage, Inc.

Address    PO Box 6030
Number            Street

Sioux Falls, SD 57117-6030
City                                                    State    Zip Code

Contact phone  (866)613-5636            Email  Citi.Poc@citi.com



**U.S. Bankruptcy Court**
**EASTERN DISTRICT of CALIFORNIA (SACRAMENTO)**

Debtor: **Michael Angelo Farrace**

Case No. 13-24657

**CERTIFICATE OF SERVICE**

I hereby certify that on 06/28/2013, I served a copy of this Notice and all attachments on the following by U.S. Mail, postage prepaid:

| | |
|---|---|
| Debtor: | **Michael Angelo Farrace** |
| | 5024 12TH AVE |
| | SACRAMENTO, CA 95820-2224 |

I hereby certify that on 06/27/2013, I served a copy of this Notice and all attachments on the following by Electronic Notification:

| | |
|---|---|
| Trustee: | **David Cusick** |
| | PO Box 1858 |
| | Sacramento, CA 95812-1858 |

| | |
|---|---|
| Debtors Counsel: | **Gary Ray Fraley** |
| | 1401 El Camino Ave #370 |
| | Sacramento, CA 95815-2747 |

/s/Timothy Patrick Kennedy

Bankruptcy Specialist

CitiMortgage

P.O. Box 6243
Sioux Falls, SD 57117
Customer Service 1-800-283-7918*
TTY Services available: Dial 711 from the United States;
Dial 1-866-280-2050 from Puerto Rico

©2011 CitiMortgage, Inc. CitiMortgage, Inc. does business as Citicorp Mortgage in NM. CitiMortgage, Inc. is an equal housing lender. Citi, Arc Design, and Citi and Arc Design are registered service marks of Citigroup Inc.

**Case 13-24657    Filed 06/27/16    Doc**

Escrow Account Disclosure S

REPRESENTATION OF PRINTED DOCUMENT

Page 1

David Cusick
PO Box 1858
Sacramento, CA 95812-1858

**Annual Escrow Analysis**

Account Number:
Analysis Date:                    June 20, 2013

CASE# 13-24657

TO THE EXTENT YOUR OBLIGATION HAS BEEN DISCHARGED OR IS SUBJECT TO AN AUTOMATIC STAY OF BANKRUPTCY ORDER UNDER TITLE 11 OF THE UNITED STATES CODE, THIS NOTICE IS FOR COMPLIANCE AND INFORMATIONAL PURPOSES ONLY AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT OR AN ATTEMPT TO COLLECT ANY SUCH OBLIGATION. IF YOU ARE REPRESENTED BY AN ATTORNEY, PLEASE NOTIFY US AND PROVIDE THIS CORRESPONDENCE TO YOUR ATTORNEY.

**Mortgage Payment**

New Monthly Payment Amount:    **$2,364.16**    New Payment Effective:    **August 01, 2013**

|  | CURRENT PAYMENT | NEW PAYMENT |
|---|---|---|
| PRINCIPAL/INTEREST | 1,905.45 | 1,905.45 |
| MONTHLY ESCROW PAYMENT | 1,207.99 | 458.71 |
| TOTAL PAYMENT | 3,113.44 | 2,364.16 |

- Your new monthly escrow payment represents 1/12th of your projected annual escrow disbursements
- If your payment is issued by a third party, or if you make your payments through a bill pay service, please take the appropriate action to ensure that the new amount is updated with the service provider.

**Projections for the coming Year**

Please keep this statement for reference next year.

| MONTH | PAYMENTS TO ESCROW ACCT | PAYMENTS FROM ESCROW ACCT | DESCRIPTION | PROJECTED BALANCE | REQUIRED BALANCE |
|---|---|---|---|---|---|
| Starting Balance: | (Activity Assumed through July, 2013) | | | $5,405.41 | $2,752.30 |
| AUG 13 | 458.71 | .00 | | 5,864.12 | 3,211.01 |
| SEP 13 | 458.71 | .00 | | 6,322.83 | 3,669.72 |
| OCT 13 | 458.71 | .00 | | 6,781.54 | 4,128.43 |
| NOV 13 | 458.71 | 2,752.28 | COUNTY TAX | 4,487.97 | 1,834.66 |
| DEC 13 | 458.71 | .00 | | 4,946.68 | 2,293.57 |
| JAN 14 | 458.71 | .00 | | 5,405.39 | 2,752.28 |
| FEB 14 | 458.71 | .00 | | 5,864.10 | 3,210.99 |
| MAR 14 | 458.71 | 2,752.28 | COUNTY TAX | 3,570.53 (a) | 917.42 (b) |
| APR 14 | 458.71 | .00 | | 4,029.24 | 1,376.13 |
| MAY 14 | 458.71 | .00 | | 4,487.95 | 1,834.84 |
| JUN 14 | 458.71 | .00 | | 4,946.66 | 2,293.55 |
| JUL 14 | 458.71 | .00 | | 5,405.37 | 2,752.26 |
| TOTALS: | $5,504.52 | $5,504.56 | | | |

- Mortgage Insurance, if any, is not included in the required low point calculation.

**Determining Your Escrow Shortage/Surplus**

| PROJECTED LOW-POINT: | 3,570.53 | (a) |
| REQUIRED LOW-POINT (Cushion): | 917.42 | (b) |
| TOTAL ESCROW SURPLUS: | 2,653.11 | |

Under Federal Law, your surplus may be returned to you via a check. Since not all payments have been received on your account, you will not receive a check for your escrow surplus. If your Projected Low-Point (a) is:
- Less than your Required Low-Point (b), you have a shortage.
- Greater than your Required Low-Point (b), you have a surplus.
- Equal to your Required Low-Point (b), the above does not apply.

**CitiMortgage, Inc. appreciates your business.**

**Escrow Account Disclosure Statement**

Pago 2            Case 13-24657  Filed 05/24/13  Doc

REPRESENTATION OF PRINTED DOCUMENT

Account Number:
Analysis Date:            June 20, 2013
Annual Escrow Analysis

**Account History**

Please note the increases/decreases that may have occurred from the projections. This has impacted the shortage/surplus in this analysis reflected on the front side of this statement.

| ITEM | ACTUAL PAYMENTS | PROJECTED PAYMENTS | INCREASE/ DECREASE |
|---|---|---|---|
| COMBINED TAXES | 5,504.56 | 5,317.00 | 187.56 |

This is a statement of actual activity in your escrow account from June 1, 2012 through June 20, 2013. This section provides last year's projections and compares it with actual activity.

Your most recent monthly mortgage payment during the past year was $3,113.44 of which $1,905.45 was for principal and interest and $1,207.99 was credited to your escrow account.

| MONTH | ACTUAL PAYMENTS TO ESCROW ACCOUNT | PROJECTED PAYMENTS TO ESCROW ACCOUNT | ACTUAL PAYMENTS FROM ESCROW ACCOUNT | PROJECTED PAYMENTS FROM ESCROW ACCOUNT | DESCRIPTION | ACTUAL ESCROW RUNNING BALANCE | PROJECTED ESCROW RUNNING BALANCE |
|---|---|---|---|---|---|---|---|
| Starting Balance: | | | | | | $8,586.01- | $7,656.75- |
| JUN 12 | .00 | 427.45 * | .00 | .00 | | 8,586.01- | 7,229.30- |
| JUL 12 | .00 | 427.45 * | .00 | .00 | | 8,586.01- | 2,118.61- |
| AUG 12 | .00 | 427.45 * | .00 | .00 | | 8,586.01- | 1,691.16- |
| SEP 12 | .00 | 427.45 * | .00 | .00 | | 8,586.01- | 1,263.71- |
| OCT 12 | .00 | 427.45 * | .00 | .00 | | 8,586.01- | 836.26- |
| NOV 12 | .00 | 427.45 * | 2,752.28 | 2,564.72 * | COUNTY TAX | 11,338.29- | 2,973.53- |
| DEC 12 | .00 | 427.45 * | .00 | .00 | | 11,338.29- | 2,546.08- |
| JAN 13 | .00 | 427.45 * | .00 | .00 | | 11,338.29- | 2,118.63- |
| FEB 13 | .00 | 427.45 * | .00 | .00 | | 11,338.29- | 1,691.18- |
| MAR 13 | .00 | 458.71 * | 2,752.28 | 2,752.28 | COUNTY TAX | 14,090.57- | 2,072.01 |
| APR 13 | .00 | 458.71 * | .00 | .00 | | 14,090.57- | 2,530.72 |
| MAY 13 | .00 | 458.71 * | .00 | .00 | | 14,090.57- | 4,487.99 |
| JUN 13 | .00 | 458.71 * | .00 | .00 | | 14,090.57- | 4,946.70 |
| Totals: | $.00 | $5,681.89 | $5,504.56 | $5,317.00 | | | |

An asterisk (*) indicates a difference from a previous estimate either in the date or amount. Payment differences of $2.00 or less will not be marked with an asterisk.

Under Federal Law, your lowest monthly balance should not have exceeded $917.42 which is 1/6 of anticipated payments unless your mortgage contract or state law specifies a lower amount. Under your mortgage contract or state law, your lowest monthly balance should not have exceeded $917.42.

671-2249-0111B

CitiMortgage may charge interest on funds advanced to pay your escrow items. If you do not repay the escrow advance within 60 days (of the Escrow Analysis Statement date above) interest will be charged on the outstanding advance amount. The rate of interest on the advance will be the Note rate applicable to your first mortgage loan. The monthly interest accrual will appear on your monthly Mortgage Statement.

B 10S1 (Supplement 1) (12/11)

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT of CALIFORNIA (SACRAMENTO)

In re  Michael Angelo Farrace
_____,
Debtor

Case No. 13-24657

Chapter 13

## Notice of Mortgage Payment Change

**If you file a claim secured by a security interest in the debtor's principal residence provided for under the debtor's plan pursuant to § 1322(b)(5), you must use this form to give notice of any changes in the installment payment amount. File this form as a supplement to your proof of claim at least 21 days before the new payment amount is due.  See Bankruptcy Rule 3002.1.**

**Name of creditor:** CitiMortgage, Inc.

**Court claim no. (if known):** 3

**Last four digits** of any number you use to identify the debtor's account:  5  3  2  2

**Date of payment change:** 03/01/2014
Must be at least 21 days after date of this notice  mm/dd/yyyy

**New total payment:** $ 2286.72
Principal, interest, and escrow, if any

### Part 1: Escrow Account Payment Adjustment

**Will there be a change in the debtor's escrow account payment?**

☐ No
☑ Yes    Attach a copy of the escrow account statement prepared in a form consistent with applicable nonbankruptcy law. Describe the basis for the change. If a statement is not attached, explain why: _____

**Current escrow payment:** $ 1207.99              **New escrow payment:** $ 381.27

### Part 2: Mortgage Payment Adjustment

**Will the debtor's principal and interest payment change based on an adjustment to the interest rate in the debtor's variable-rate note?**

☑ No
☐ Yes    Attach a copy of the rate change notice prepared in a form consistent with applicable nonbankruptcy law. If a notice is not attached, explain why: _____

**Current interest rate:** _____%              **New interest rate:** _____%

**Current principal and interest payment:** $ _____    **New principal and interest payment:** $ _____

### Part 3: Other Payment Change

**Will there be a change in the debtor's mortgage payment for a reason not listed above?**

☑ No
☐ Yes    Attach a copy of any documents describing the basis for the change, such as a repayment plan or loan modification agreement. *(Court approval may be required before the payment change can take effect.)*

**Reason for change:** _____

**Current mortgage payment:** $ _____    **New mortgage payment:** $ _____

B 10 (Supplement 1) (12/11)

## Part 4: Sign Here

The person completing this Notice must sign it.  Sign and print your name and your title, if any, and state your address and telephone number if different from the notice address listed on the proof of claim to which this Supplement applies.

Check the appropriate box.

☑ I am the creditor.          ☐ I am the creditor's authorized agent.
                              (Attach copy of power of attorney, if any.)

I declare under penalty of perjury that the information provided in this Notice is true and correct to the best of my knowledge, information, and reasonable belief.

✖ /s/ Clarence W  (Wayne) Adams                                    Date    01/27/2014
   Signature                                                               mm/dd/yyyy

Print:        Clarence W  (Wayne) Adams                           Title   Bankruptcy Specialist
              First Name          Middle Name        Last Name

Company       CitiMortgage, Inc.

Address       PO Box 6030
              Number            Street
              Sioux Falls, SD  57117-6030
              City                              State      ZIP Code

Contact phone  (866) 613-5636                                     Email   CITIPCN@citi.com

**U.S. Bankruptcy Court**
**EASTERN DISTRICT of CALIFORNIA (SACRAMENTO)**

Debtor:    Michael Angelo Farrace

Case No. 13-24657

### CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2014, I served a copy of this Notice and all attachments on the following by U.S. Mail, postage prepaid:

Debtor:              Michael Angelo Farrace

                       5024 12TH AVE
                       SACRAMENTO, CA 95820

I hereby certify that on January 27, 2014, I served a copy of this Notice and all attachments on the following by Electronic Notification:

Trustee:            David Cusick
                       PO BOX 1858
                       SACRAMENTO, CA 95812

Debtors Counsel:      Gary Ray Fraley
                       1401 El Camino Ave #370
                       Sacramento, CA 95815

                                      /s/Clarence W (Wayne) Adams
                                      Bankruptcy Specialist



CitiMortgage

P.O. Box 6243
Sioux Falls, SD 57117
Customer Service 1-800-283-7918*
TTY Services available: Dial 711 from the United States;
Dial 1-866-280-2050 from Puerto Rico

©2011 CitiMortgage, Inc. CitiMortgage, Inc. does business as Citicorp Mortgage in
NM. CitiMortgage, Inc. is an equal housing lender. Citi, Arc Design, and Citi and Arc
Design are registered service marks of Citigroup Inc.

Page 1

3-471-83304-0000500-001-1-000-000-000-000
DAVID CUSICK
PO BOX 1858
SACRAMENTO CA 95812-1858

**Escrow Account Disclosure Statement**
REPRESENTATION OF PRINTED DOCUMENT

**Annual Escrow Analysis**

Account Number
Analysis Date                    January 17, 2014

CASE# 13-24657
MICHAEL FARRACE

TO THE EXTENT YOUR OBLIGATION HAS BEEN DISCHARGED OR IS SUBJECT TO AN AUTOMATIC STAY OF BANKRUPTCY ORDER UNDER TITLE 11 OF THE UNITED STATES CODE, THIS NOTICE IS FOR COMPLIANCE AND INFORMATIONAL PURPOSES ONLY AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT OR AN ATTEMPT TO COLLECT ANY SUCH OBLIGATION. IF YOU ARE REPRESENTED BY AN ATTORNEY, PLEASE NOTIFY US AND PROVIDE THIS CORRESPONDENCE TO YOUR ATTORNEY.

### Mortgage Payment

| New Monthly Payment Amount: | $2,286.72 | New Payment Effective: | March 01, 2014 |
|---|---|---|---|

| | CURRENT PAYMENT | NEW PAYMENT |
|---|---|---|
| PRINCIPAL/INTEREST | 1,905.45 | 1,905.45 |
| MONTHLY ESCROW PAYMENT | 1,207.99 | 381.27 |
| TOTAL PAYMENT | 3,113.44 | 2,286.72 |

- Your new monthly escrow payment represents 1/12th of your projected annual escrow disbursements.
- If your payment is issued by a third party, or if you make your payments through a bill pay service, please take the appropriate action to ensure that the new amount is updated with the service provider.

### Projections for the coming Year

Please keep this statement for reference next year.

| MONTH | PAYMENTS TO ESCROW ACCT | PAYMENTS FROM ESCROW ACCT | DESCRIPTION | PROJECTED BALANCE | REQUIRED BALANCE |
|---|---|---|---|---|---|
| Starting Balance: (Activity Assumed through February, 2014) | | | | $6,328.75 | $2,668.90 |
| MAR 14 | 381.27 | 2,287.63 | COUNTY TAX | 4,422.39 (a) | 762.54 (b) |
| APR 14 | 381.27 | .00 | | 4,803.66 | 1,143.81 |
| MAY 14 | 381.27 | .00 | | 5,184.93 | 1,525.08 |
| JUN 14 | 381.27 | .00 | | 5,566.20 | 1,906.35 |
| JUL 14 | 381.27 | .00 | | 5,947.47 | 2,287.62 |
| AUG 14 | 381.27 | .00 | | 6,328.74 | 2,668.89 |
| SEP 14 | 381.27 | .00 | | 6,710.01 | 3,050.16 |
| OCT 14 | 381.27 | .00 | | 7,091.28 | 3,431.43 |
| NOV 14 | 381.27 | 2,287.63 | COUNTY TAX | 5,184.92 | 1,525.07 |
| DEC 14 | 381.27 | .00 | | 5,566.19 | 1,906.34 |
| JAN 15 | 381.27 | .00 | | 5,947.46 | 2,287.61 |
| FEB 15 | 381.27 | .00 | | 6,328.73 | 2,668.88 |
| TOTALS: | $4,575.24 | $4,575.26 | | | |

671-2248-0111F

- Mortgage Insurance, if any, is not included in the required low point calculation.

### Determining Your Escrow Shortage/Surplus

| PROJECTED LOW-POINT: | 4,422.39 | (a) |
|---|---|---|
| REQUIRED LOW-POINT (Cushion): | 762.54 | (b) |
| TOTAL ESCROW SURPLUS: | 3,659.85 | |

Under Federal Law, your surplus may be returned to you via a check. Since not all payments have been received on your account, you will not receive a check for your escrow surplus. If your Projected Low-Point is (a):

- Less than your Required Low-Point (b), you have a shortage.
- Greater than your Required Low-Point (b), you have a surplus.
- Equal to your Required Low-Point (b), the above does not apply.

## CitiMortgage, Inc. appreciates your business.

C26845

Case 13-24657    Filed 01/27/14    Doc

Page 2

Escrow Account Disclosure Statement

REPRESENTATION OF PRINTED DOCUMENT

Account Number:
Analysis Date:         January 17, 2014
Annual Escrow Analysis

| | | | Account History | |
|---|---|---|---|---|
| Please note the increases/decreases that may have occurred from the projections. This has impacted the shortage/surplus in this analysis reflected on the front side of this statement. | ITEM | ACTUAL PAYMENTS | PROJECTED PAYMENTS | INCREASE/ DECREASE |
| | COMBINED TAXES | 5,039.91 | 5,504.56 | -464.65 |

This is a statement of actual activity in your escrow account from January 1, 2013 through January 17, 2014.
This section provides last year's projections and compares it with actual activity.

Your most recent monthly mortgage payment during the past year was $3,113.44 of which $1,905.45 was for principal and interest and $1,207.99 was credited to your escrow account.

| MONTH | ACTUAL PAYMENTS TO ESCROW ACCOUNT | PROJECTED PAYMENTS TO ESCROW ACCOUNT | ACTUAL PAYMENTS FROM ESCROW ACCOUNT | PROJECTED PAYMENTS FROM ESCROW ACCOUNT | DESCRIPTION | ACTUAL ESCROW RUNNING BALANCE | PROJECTED ESCROW RUNNING BALANCE |
|---|---|---|---|---|---|---|---|
| Starting Balance: | | | | | | $11,338.29- | $2,546.08- |
| JAN 13 | .00 | 427.45 * | .00 | .00 | | 11,338.29- | 2,118.63- |
| FEB 13 | .00 | 427.45 * | .00 | .00 | | 11,338.29- | 1,691.18- |
| MAR 13 | .00 | 458.71 * | 2,752.28 | 2,752.28 | COUNTY TAX | 14,090.57- | 2,072.01 |
| APR 13 | .00 | 458.71 * | .00 | .00 | | 14,090.57- | 2,530.72 |
| MAY 13 | .00 | 458.71 * | .00 | .00 | | 14,090.57- | 4,487.99 |
| JUN 13 | .00 | 458.71 * | .00 | .00 | | 14,090.57- | 4,946.70 |
| JUL 13 | 1,207.99 | 458.71 * | .00 | .00 | | 12,882.58- | 5,405.41 |
| AUG 13 | 1,207.99 | 458.71 * | .00 | .00 | | 11,674.59- | 5,864.12 |
| SEP 13 | 1,207.99 | 458.71 * | .00 | .00 | | 10,466.60- | 6,322.83 |
| OCT 13 | .00 | 458.71 * | .00 | .00 | | 10,466.60- | 6,781.54 |
| NOV 13 | 2,415.98 | 458.71 * | 2,287.63 | 2,752.28 * | COUNTY TAX | 10,338.25- | 4,487.97 |
| DEC 13 | 1,207.99 | 458.71 * | .00 | .00 | | 9,130.26- | 4,946.68 |
| JAN 14 | 1,207.99 | 458.71 * | .00 | .00 | | 7,922.27- | 5,405.39 |
| Totals: | $8,455.93 | $5,900.71 | $5,039.91 | $5,504.56 | | | |

An asterisk (*) indicates a difference from a previous estimate either in the date or amount. Payment differences of $2.00 or less will not be marked with an asterisk.

Under Federal Law, your lowest monthly balance should not have exceeded $917.42 which is 1/6 of anticipated payments unless your mortgage contract or state law specifies a lower amount. Under your mortgage contract or state law, your lowest monthly balance should not have exceeded $917.42.

071-2249-0111B

CitiMortgage may charge interest on funds advanced to pay your escrow items. If you do not repay the escrow advance within 60 days (of the Escrow Analysis Statement date above) interest will be charged on the outstanding advance amount. The rate of interest on the advance will be the Note rate applicable to your first mortgage loan. The monthly interest accrual will appear on your monthly Mortgage Statement.

C671EP

04/22/2011

# EXHIBIT H



**Shellpoint**
Mortgage Servicing

**DO NOT SEND MAIL OR PAYMENTS TO THIS ADDRESS**
P.O. Box 619063 • Dallas, TX 75261-9063

7-811-01345-0000145-001-1-001-010-000-000

MICHAEL FARRACE
2340 SKUBE LN
SACRAMENTO CA 95825-6322

# MORTGAGE STATEMENT
Statement Date: 12/06/2016

| | |
|---|---|
| Account Number | 0568481405 |
| Next Payment Date | 01/01/2017 |
| **Contractual Payment Amount** | **$25,829.73** |

*If payment is received after 01/16/2017, $0.00 late fee may be assessed.*

| | |
|---|---|
| Phone: | 800-365-7107 |
| Website: | www.shellpointmtg.com |

## Explanation of Amount Due

| | |
|---|---|
| Principal | $1,377.75 |
| Interest | $527.70 |
| Escrow (Taxes and Insurance) | $501.75 |
| **Regular Monthly Payment** | **$2,407.20** |
| Total Fees and Charges | $0.00 |
| Overdue Payment | $23,422.53 |
| **Total Amount Due** | **$25,829.73** |

## Account Information

| | |
|---|---|
| Outstanding Principal | $129,881.07 |
| Interest Rate | 5.5000% |
| Prepayment Penalty | None |
| Property Address: | 3670 FAIR OAKS |
| | SACRAMENTO CA 95864 |
| Contractual Due Date: | February 1, 2016 |
| Current Escrow Balance: | -$663.87 |

## Past Payments Breakdown

| | Paid Last Month | Paid Year to Date |
|---|---|---|
| Principal | $1,304.18 | $16,497.95 |
| Interest | $601.27 | $8,272.90 |
| Escrow | $381.27 | $4,960.79 |
| Fees/Late Charges | $0.00 | $1,861.35 |
| Unapplied Partial Payment | $736.18 | $3,026.19 |
| Total | $3,022.90 | $34,619.18 |

## Transaction Activity (11/06/2016 - 12/05/2016)

| Date | Description | Charges | Payments |
|---|---|---|---|
| 11/09/2016 | Partial Payment Unapplied* | $0.00 | $740.23 |
| 11/09/2016 | Partial Payment Unapplied* | $0.00 | $2,282.67 |
| 11/10/2016 | Partial Payment Unapplied* | $0.00 | -$2,286.72 |
| 11/10/2016 | Regular Payment - (Due 1/1/2016) | $0.00 | $2,286.72 |
| 11/16/2016 | County Tax Bill 1 | $2,345.99 | $0.00 |

## Important Messages

*Partial Payments: Any partial payments that you make are not applied to your mortgage, but instead are held in a separate suspense account according to applicable state law. If you pay the balance of a partial payment, the funds will be applied to your mortgage.

## Additional Messages

Please visit our website at www.shellpointmtg.com to view our Privacy Notice.

If you are a customer in bankruptcy or a customer who has received a bankruptcy discharge of this debt: please be advised that this notice is to advise you of the status of your mortgage loan. This notice constitutes neither a demand for payment nor a notice of personal liability to any recipient hereof, who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code. However, it may be a notice of possible enforcement of the lien against the collateral property, which has not been discharged in your bankruptcy.

Repayment options may be available to you. **Call 800-365-7107** to discuss payment arrangements. Failure to act on this matter may result in us exercising our legal rights as permitted by the contract and applicable state laws.

**For information about your payments, total amount due, and any additional payment history, see reverse side.**

## **Delinquency Notice**

**You are late on your mortgage payments. Failure to bring your loan current may result in fees and foreclosure – the loss of your home.** As of 12/06/2016, you are 309 days delinquent on your mortgage loan.

**Recent Account History**
o Payment due 07/01/16:  unpaid balance of $11,386.53
o Payment due 08/01/16:  unpaid balance of $2,407.20
o Payment due 09/01/16:  unpaid balance of $2,407.20
o Payment due 10/01/16:  unpaid balance of $2,407.20
o Payment due 11/01/16:  unpaid balance of $2,407.20
o Payment due 12/01/16:  unpaid balance of $2,407.20
o Payment due 01/01/17:  current payment due

o Total: **$25,829.73 due. You must pay this amount to bring your loan current.**

If You Are Experiencing Difficulty: Please refer to the back of this statement for additional messages about mortgage counseling and assistance.

## Transaction Activity (11/06/2016 - 12/05/2016) - continued

| Date | Description | Charges | Payments |
|------|-------------|---------|----------|
| 12/05/2016 | Occ Prop Insp Disbursement | $15.00 | $0.00 |

**Important Notice:** Shellpoint Mortgage Servicing is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

**Amount Due on Accounts In Foreclosure or Bankruptcy:** If your account is in foreclosure or bankruptcy the amount listed as the Amount Due may not be the full amount necessary to bring your account current. To obtain up-to-date amount due information, please contact us at the number listed on the statement.

For budget advice and credit counseling assistance please call the U.S. Department of Housing and Urban Development (HUD) at 800-569-4287 or at http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm.

Amounts paid in excess of your payment amount will first be used to satisfy any delinquency. If there are no past due amounts then excess funds paid will be posted to your principal balance. As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

Shellpoint Mortgage Servicing may assess a returned check fee consistent with the laws for your state and your loan documents on all checks returned by your financial institution. Additionally, Shellpoint may charge a fee for processing payoff requests.

Si usted no entiende el contenido de esta carta, por favor contacte a uno de nuestros representantes que hablan español al número 800-365-7107.

# Shellpoint
## Mortgage Servicing

**DO NOT SEND MAIL OR PAYMENTS TO THIS ADDRESS**
P.O. Box 619063 • Dallas, TX 75261-9063

7-811-01345-0000145-001-1-001-010-000-000

MICHAEL FARRACE
2340 SKUBE LN
SACRAMENTO CA 95825-6322

## MORTGAGE STATEMENT
Statement Date: 12/06/2016

| | |
|---|---|
| Account Number | 0568481405 |
| Next Payment Date | 01/01/2017 |
| **Contractual Payment Amount** | **$25,829.73** |

*If payment is received after 01/16/2017, $0.00 late fee may be assessed.*

| | |
|---|---|
| Phone: | 800-365-7107 |
| Website: | www.shellpointmtg.com |

### Explanation of Amount Due

| | |
|---|---|
| Principal | $1,377.75 |
| Interest | $527.70 |
| Escrow (Taxes and Insurance) | $501.75 |
| **Regular Monthly Payment** | **$2,407.20** |
| Total Fees and Charges | $0.00 |
| Overdue Payment | $23,422.53 |
| **Total Amount Due** | **$25,829.73** |

## Account Information

| | |
|---|---|
| Outstanding Principal | $129,881.07 |
| Interest Rate | 5.5000% |
| Prepayment Penalty | None |
| Property Address: | 3670 FAIR OAKS |
| | SACRAMENTO CA 95864 |
| Contractual Due Date: | February 1, 2016 |
| Current Escrow Balance: | -$663.87 |

### Past Payments Breakdown

| | Paid Last Month | Paid Year to Date |
|---|---|---|
| Principal | $1,304.18 | $16,497.95 |
| Interest | $601.27 | $8,272.90 |
| Escrow | $381.27 | $4,960.79 |
| Fees/Late Charges | $0.00 | $1,861.35 |
| Unapplied Partial Payment | $736.18 | $3,026.19 |
| **Total** | **$3,022.90** | **$34,619.18** |

## Transaction Activity (11/06/2016 - 12/05/2016)

| Date | Description | Charges | Payments |
|---|---|---|---|
| 11/09/2016 | Partial Payment Unapplied* | $0.00 | $740.23 |
| 11/09/2016 | Partial Payment Unapplied* | $0.00 | $2,282.67 |
| 11/10/2016 | Partial Payment Unapplied* | $0.00 | -$2,286.72 |
| 11/10/2016 | Regular Payment - (Due 1/1/2016) | $0.00 | $2,286.72 |
| 11/16/2016 | County Tax Bill 1 | $2,345.99 | $0.00 |

## Important Messages

**Partial Payments:** Any partial payments that you make are not applied to your mortgage, but instead are held in a separate suspense account according to applicable state law. If you pay the balance of a partial payment, the funds will be applied to your mortgage.

## Additional Messages

Please visit our website at www.shellpointmtg.com to view our Privacy Notice.

If you are a customer in bankruptcy or a customer who has received a bankruptcy discharge of this debt: please be advised that this notice is to advise you of the status of your mortgage loan. This notice constitutes neither a demand for payment nor a notice of personal liability to any recipient hereof, who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code. However, it may be a notice of possible enforcement of the lien against the collateral property, which has not been discharged in your bankruptcy.

Repayment options may be available to you. **Call 800-365-7107** to discuss payment arrangements. Failure to act on this matter may result in us exercising our legal rights as permitted by the contract and applicable state laws.

**For information about your payments, total amount due, and any additional payment history, see reverse side.**

### **Delinquency Notice**

You are late on your mortgage payments. Failure to bring your loan current may result in fees and foreclosure – the loss of your home. As of 12/06/2016, you are 309 days delinquent on your mortgage loan.

**Recent Account History**
o Payment due 07/01/16: unpaid balance of $11,386.53
o Payment due 08/01/16: unpaid balance of $2,407.20
o Payment due 09/01/16: unpaid balance of $2,407.20
o Payment due 10/01/16: unpaid balance of $2,407.20
o Payment due 11/01/16: unpaid balance of $2,407.20
o Payment due 12/01/16: unpaid balance of $2,407.20
o Payment due 01/01/17: current payment due
o Total: $25,829.73 due. **You must pay this amount to bring your loan current.**

If You Are Experiencing Difficulty: Please refer to the back of this statement for additional messages about mortgage counseling and assistance.

Detach and return with payment.

**ansaction Activity (11/06/2016 - 12/05/2016) - continued**

| te | Description | Charges | Payments |
|---|---|---|---|
| /05/2016 | Occ Prop Insp Disbursement | $15.00 | $0.00 |

**Important Notice:** Shellpoint Mortgage Servicing is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose.

**Amount Due on Accounts in Foreclosure or Bankruptcy:** If your account is in foreclosure or bankruptcy the amount listed as the Amount Due may not be the full amount necessary to bring your account current. To obtain up-to-date amount due information, please contact us at the number listed on the statement.

For budget advice and credit counseling assistance please call the U.S. Department of Housing and Urban Development (HUD) at 800-569-4287 or at http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm.

Amounts paid in excess of your payment amount will first be used to satisfy any delinquency. If there are no past due amounts then excess funds paid will be posted to your principal balance. As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

Shellpoint Mortgage Servicing may assess a returned check fee consistent with the laws for your state and your loan documents on all checks returned by your financial institution. Additionally, Shellpoint may charge a fee for processing payoff requests.

Si usted no entiende el contenido de esta carta, por favor contacte a uno de nuestros representantes que hablan español al número 800-365-7107.

.

# EXHIBIT I



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

|                              |     |                          |
|------------------------------|-----|--------------------------|
| In re:                       | )   |                          |
|                              | )   | Case No. 11-33377-TJC    |
| **ERNESTINE C.J. GREEN,**    | )   | Chapter 13               |
|                              | )   |                          |
| Debtor                       | )   |                          |
| _____ | )   |                          |

## ORDER APPROVING SETTLEMENT BETWEEN THE
## <u>UNITED STATES TRUSTEE PROGRAM AND WELLS FARGO BANK, N.A.</u>

### RECITALS

Whereas, on November 30, 2011, Ernestine C.J. Green (the "Debtor") filed a chapter 13 bankruptcy petition in the United States Bankruptcy Court for the District of Maryland, commencing this case (the "Green Case").

Whereas, on March 12, 2012, Wells Fargo Bank, N.A. ("Wells Fargo") filed a proof of claim in the Green Case asserting a secured claim in the amount of $178,243.40 arising in connection with a Note and Deed of Trust dated October 25, 2005 (the "Proof of Claim") (Claims Register for Case No. 11-33377, Claim No. 3).

Whereas, the property subject to Wells Fargo's secured claim asserted in the Proof of Claim, 32 Joyceton Terrace, Upper Marlboro, Maryland 20774, is the debtor's principal residence.

Whereas, documentation attached to the Proof of Claim asserted that the Debtor's monthly payment amount was $1,387.56.

Whereas, Wells Fargo first filed a notice of payment change in the Green Case on December 16, 2014, asserting an increase in the Debtor's monthly payment due to a change in

1

escrow, and establishing a new monthly payment amount of $1,413.33 with an effective date of January 1, 2015 (the "2014 PCN") (Claims Register for Case No. 11-33377, Claim No. 3).

Whereas, the escrow documentation attached in support of the 2014 PCN reflects an escrow analysis date of January 14, 2014, more than ten months prior to the filing of the 2014 PCN, and also states that the effective date of the Debtor's monthly payment increase is March 15, 2014, more than nine months prior to the filing of the 2014 PCN.

Whereas, the escrow documentation attached in support of the 2014 PCN further states that the Debtor's current monthly payment amount is $1,381.50, which is inconsistent with the $1,387.56 monthly payment amount set forth in the Proof of Claim filed in 2012.

Whereas, prior to the filing of the 2014 PCN, the Debtor's monthly payment amount changed one or more times due to changes in escrow, but Wells Fargo failed to file a notice of payment change.

Whereas, in addition to failing to timely file one or more PCNs[1] in the Green Case, Wells Fargo failed to file or untimely filed PCNs in other Bankruptcy Cases pending in the District of Maryland and other Districts nationwide.[2]

Whereas, the Executive Office for United States Trustees (the "EOUST") approached Wells Fargo Bank, N.A. ("Wells Fargo") with concerns regarding the timeliness of filing and the failure to file PCNs required under Bankruptcy Rule 3002.1.

Whereas, Wells Fargo confirmed systemic issues with the filing of PCNs, as well as systemic issues related to the preparation of annual escrow analyses for borrowers in Bankruptcy Cases, and the proper application of escrow shortage payments.

Whereas, Wells Fargo has entered into discussions with the EOUST to resolve these issues.

Whereas, as a result of their discussions, the parties have reached an agreement as set forth in this Order (the "Order"), subject to the final approval of the Court.

Now therefore, in consideration of the foregoing, and of the mutual promises and compromises between them, the EOUST and the United States Trustees and Acting United States Trustees for Regions 1 through 21 (collectively "the United States Trustee Program" or "USTP"), and Wells Fargo (Wells Fargo and USTP are collectively referred to herein as the "Parties") do hereby agree, stipulate and consent as follows, subject to the Court's entry of this Order and the passage of any applicable appeal period.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings assigned to them in the relevant portion of the Order.

[2] Additional examples of chapter 13 cases in which Wells Fargo untimely filed or failed to file PCNs pending in this District include: *In re Smith,* Case No. 11-15123-TJC, *In re Pegram,* Case No. 11-30095-WL, *In re White*, Case No. 13-27096-PM.

## ARTICLE I

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue in the United States Bankruptcy Court for the District of Maryland is proper pursuant to 28 U.S.C. § 1409(a).

## ARTICLE II

## DEFINITIONS

"Active Account" shall mean or refer to an account: (1) as to which one or more of the borrowers has been a debtor in a Bankruptcy Case that was pending at any time during the Relevant Period, regardless of the current status of the Bankruptcy Case; and (2) that has not been foreclosed upon, been subject to short sale, or paid in full as of the effective date of this Order.

"Bankruptcy Case" shall mean or refer to a case filed under chapter 13 of the United States Bankruptcy Code.

"Covered Conduct" shall mean and include:

1. The timeliness of PCNs filed during the Relevant Period;

2. The lack of filing of required PCNs during the Relevant Period;

3. The adequacy of Wells Fargo's policies and procedures concerning the necessity of filing and the timeliness of filing PCNs during the Relevant Period; and

4. The timeliness of preparing and communicating Escrow Analyses to borrowers in Bankruptcy Cases during the Relevant Period.

"Daily Simple Interest" shall mean a method of calculating the interest charge on a loan, which is determined by multiplying the daily interest rate by the principal by the number of days in the period. The amount of interest charged during any one period depends on the number of days in the period.

"Escrow Analysis" shall mean the annual escrow analysis for borrowers in Bankruptcy Cases with an escrow account that is required to be prepared and communicated pursuant to applicable non-bankruptcy law.

"Lines of Credit" shall mean an established maximum loan balance that the customer can borrow at any time. The amount of the monthly payment is usually calculated as a percentage of the balance owed during the period.

"Loan Modifications" shall mean an agreement to change existing loan terms in response to a borrower's long-term inability to repay the loan. Loan modifications typically involve a trial payment plan followed by a reduction of the interest rate, an extension of the length of the loan, a change in the type of loan, e.g. adjustable rate to fixed rate, or any combination.

"Missed PCNs" are changes in the amount of a payment for Active Accounts that required the filing of a PCN during the Relevant Period but for which the PCN was not filed.

"MSP" shall mean the mortgage servicing platform Wells Fargo used during the Relevant Period and continues to use to service the vast majority of its consumer home lending portfolio.

"PCN" shall mean the notice of any change in the payment amount required to be filed and served pursuant to Bankruptcy Rule 3002.1.

"Properly Filed PCN" shall mean a PCN that is: (1) timely filed with the bankruptcy court that provides the borrower with the correct payment change amount and the correct date that the new payment change will go into effect; and (2) otherwise accurate and in compliance with the requirements of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure.

"Relevant Period" shall mean the time period between December 1, 2011 and March 31, 2015.

"Untimely Escrow Analyses" shall mean Escrow Analyses required on Active Accounts that during the Relevant Period were not completed and communicated as required under applicable bankruptcy and non-bankruptcy law within a 12 month time period.

"Untimely PCNs" are PCNs filed with bankruptcy courts for Active Accounts: (1) during the Relevant Period; and (2) less than twenty-one (21) days before a payment in the new amount was due or after the effective date of the new payment amount.

## ARTICLE III

## FACTS AS THEY RELATE TO PCNS

Without waiving any privilege, Wells Fargo represents that the following facts are accurate to the best of its knowledge and belief:

<u>Accuracy and Signing Process Associated With Filing PCNs</u>

1.      Bankruptcy Rule 3002.1(b) requires a holder of a claim secured by a security interest in the debtor's principal residence, which claim is provided for in the debtor's plan under Bankruptcy Rule 1322(b)(5), to file and serve on the debtor, debtor's counsel, and the trustee a notice of any change in the payment amount, including any change that results from an interest rate or escrow account adjustment, no later than 21 days before a payment in the new amount is due.  Bankruptcy Rule 3002.1(d) requires that the PCN must be prepared as prescribed by the appropriate Official Form, and filed as a supplement to the holder's proof of claim.  Pursuant to these rules, Wells Fargo developed processes to ensure that the information contained on each PCN is accurate, and that the PCN is reviewed and signed by the individual who reviewed the

accuracy of the information contained in the PCN. As such, each PCN filed with the bankruptcy court is signed with personal knowledge of the information contained in the filing. During the Relevant Period, this process was adhered to, and as such, there were no accuracy or robo-signing issues involved in any PCN filing.

<u>Identification of Untimely PCNs</u>

2.      Prior to the December 1, 2011 implementation date required by Bankruptcy Rule 3002.1, Wells Fargo made the decision to delay implementation of its PCN process until February, 2012 in order to fully test and validate its procedures for accurately preparing, signing, and filing PCNs. Following implementation, Wells Fargo identified several occurrences that would cause a monthly mortgage payment to change that had not been previously identified. The complexity of the loan product and certain circumstances, including the calculation of Daily Simple Interest, Lines of Credit and Loan Modifications, are examples of issues that resulted in Wells Fargo not meeting the 21-day notice requirement in Bankruptcy Rule 3002.1. Collectively, these issues resulted in Wells Fargo untimely filing or not filing PCNs as required by Bankruptcy Rule 3002.1.

3.      Wells Fargo identified approximately 84,480 Active Accounts for which a PCN was or should have been filed during the Relevant Period. Of these accounts, there were 54,837 Active Accounts for which a PCN was Untimely or Missed during the Relevant Period, and 42,756 of these had an increase in the payment associated with the Untimely or Missed PCN.

4.      Even for those approximately 54,837 Active Accounts where a PCN was Missed or Untimely, Wells Fargo mailed account statements to the account borrowers at least 10 days prior to the payment change that contained the correct monthly payment amount due. In addition, Wells Fargo represents that the borrowers on these accounts were sent timely and accurate RESPA and/or TILA notices that indicated their correct payment change.

## **ARTICLE IV**

## **FACTS AS THEY RELATE TO ESCROW**

Without waiving any privilege, Wells Fargo represents that the following facts are accurate to the best of its knowledge and belief:

5.      Wells Fargo utilizes MSP in connection with the preparation of Escrow Analyses for borrowers. Wells Fargo became aware of a technical issue with MSP in March, 2013, relating to storing Escrow Analyses for delinquent loans. As a result of this issue, during the Relevant Period through October, 2013, Wells Fargo did not always prepare annual Escrow Analyses within a 12-month timeframe. Specifically, MSP could only store 2 Escrow Analyses for an account at a time: the currently effective Escrow Analysis and the pending Escrow Analysis that would next go into effect. If a third Escrow Analysis was run, and the pending Escrow Analysis had not yet become effective, the newly generated third Escrow Analysis would overwrite the pending Escrow Analysis. Because of this technical limitation, Wells Fargo implemented a policy to delay Escrow Analyses when running an analysis that could lead to overwriting a pending Escrow Analysis.

6.     In November, 2013, changes were made to the MSP system to eliminate the overwriting of any pending Escrow Analyses.

7.     Following this system change, Wells Fargo began the process of performing annual Escrow Analyses that had not been completed within a 12-month timeframe.  This process began in December, 2013 and was completed on February, 2015.

8.     Wells Fargo identified approximately 18,538 instances of Untimely Escrow Analyses during the Relevant Period for borrowers with Active Accounts.

9.     During the Relevant Period, upon completing Escrow Analyses, Wells Fargo communicated to borrowers information related to any escrow shortage amount.

10.     The information communicated to the borrower contained an option to spread the escrow shortage over 12 months or pay the shortage in a lump sum.  Borrowers who paid the lump sum and also contacted Wells Fargo had their monthly payment amount adjusted.

11.     However, for the calendar year 2014 through June, 2015, Wells Fargo has identified approximately 2,400 customers with Active Accounts who made a lump sum escrow shortage payment during the Relevant Period but did not have their monthly payment amount automatically reduced consistent with the payment of the escrow shortage due to a system control, which automatically spread escrow shortages shown on the Escrow Analysis for customers in bankruptcy (the "Escrow Shortage Borrowers").

## ARTICLE V

## OPERATIONAL ENHANCEMENTS

12.     Wells Fargo has implemented, or will implement, a number of operational enhancements to ensure that all PCNs filed in Bankruptcy Cases going forward are Properly Filed PCNs.  Wells Fargo has or will enhance policies and procedures for the preparation, signing and filing of PCNs so that they make clear that, at minimum, a PCN is filed in bankruptcy court not less than 21 days before a payment in the new amount is due.  Included in these operational enhancements are the following items:

    a. A comprehensive training program for all PCN reviewers/signers, which includes three initial training sessions, annual refresher training, access to current policies and procedures for all team members, job aids, and tracking of team members' performance and completion of training sessions;

    b. A certification process for team members upon completion of a training program, which grants the team member authority to sign documents on behalf of Wells Fargo;

    c. A consistent, documented process for team members who serve as PCN reviewers/signers to follow, which ensures PCNs are properly completed and reviewed prior to signing and filing;

    d.   A monitoring process to validate that team members who serve as PCN reviewers/signers have the proper authority and ECF accreditation to file documents in the various bankruptcy courts; and

    e.   A control process to review the timeliness, quality, and accuracy of required PCNs, including the population requiring a PCN filing. This process includes the following areas:

        i.   Reviews of the timeliness, quality, and accuracy of PCNs through monthly sampling of the reviewers'/signers' work by random selection of PCN reviewers/signers by two different teams, including an internal quality assurance team and a compliance team, which does not report to mortgage servicing management;

        ii.   Preparation of reports showing all future changes in the monthly payment amount for customers in bankruptcy, and reviews of the populations identified in those reports to ensure that PCNs were timely and properly filed; and

        iii.   Reports from these different teams are delivered to senior management within the bankruptcy unit and mortgage servicing for review.

13.    For an account where an Untimely or Missed PCN has occurred on a payment increase, Wells Fargo's policy is to credit the account for the aggregate difference between the prior properly noticed payment amount and the payment amount associated with the Untimely or Missed PCN through the earlier of when: (a) a Properly Filed PCN is filed; (b) a Motion for Relief from Stay is filed; (c) the Bankruptcy Case is dismissed or converted; or (d) the borrower receives a discharge. Wells Fargo's policy is to reconcile the borrower's account before a Motion for Relief from stay is filed and prior to releasing the account back to non-bankruptcy servicing after the Bankruptcy Case is dismissed or converted, or the borrower receives a discharge.

14.    As discussed, in November, 2013, changes were made to the MSP system to eliminate the overwriting of any pending Escrow Analyses. Wells Fargo also implemented or revised its policies to ensure that Escrow Analyses would be run on a 12-month cycle. In addition, Wells Fargo revised its policies to ensure that any customer in bankruptcy who paid their escrow shortage in a lump sum would have their monthly payment automatically reduced pursuant to the Escrow Analysis.

15.    Wells Fargo's operational enhancements described in this Article shall be implemented on or before November 30, 2015 (the "Operational Enhancement Date").

## ARTICLE VI

## PCN AND ESCROW CORRECTIVE ACTION

A.  PCN Corrective Action

16.    Wells Fargo has identified approximately 42,756 Active Accounts for which there were Untimely or Missed PCNs and the associated monthly payment increased on the account. Wells Fargo represents that the borrowers on these accounts received notices of the increase on account statements or in RESPA and/or TILA notices.  For these accounts in which there were Untimely or Missed PCNs and the payment increased, Wells Fargo has or will take the following corrective actions:

a.    For these approximately 42,756 Active Accounts, Wells Fargo will provide a credit (the "Payment Increase Credit") to each of these accounts as follows:

| Number of Impacted Accounts | Unpaid Principal Balance as of March 31, 2015 | Credit to Customer Account |
|---|---|---|
| 7,932 | Up to $74,999 | $708 |
| 14,373 | $75,000-$149,999 | $1,026 |
| 13,006 | $150,000-$299,999 | $1,313 |
| 7,099 | $300,000-$699,999 | $1,968 |
| 346 | $700,000 or more | $6,360 |

b.    In addition to providing the Payment Increase Credit, Wells Fargo shall also undertake an account reconciliation for the Active Accounts identified in Paragraph 16(a) when the earliest of one of the following events occurs: (1) Wells Fargo files a Motion for Relief from Stay; (2) the Bankruptcy Case is dismissed or converted; or (3) the debtor receives a discharge.  Upon undertaking the account reconciliation, Wells Fargo will credit those Active Accounts for: (1) the aggregate difference between the prior properly noticed payment amount and the payment amount associated with the Untimely or Missed PCN through the earlier of when a Properly Filed PCN is filed, a Motion for Relief from Stay is filed, the Bankruptcy Case is dismissed or converted, or the borrower receives a discharge (the "Reconciliation Amount"); (2) less the Payment Increase Credit and any other credits previously paid under Paragraph 16(c).  If the amount of the credit under Paragraph 16(a) is in excess of the Reconciliation Amount, the borrower shall not receive any additional credit and Wells Fargo shall not receive any refund; and

c.    For approximately 8,000 Active Accounts and other accounts, which are no longer Active Accounts, Wells Fargo has previously credited the aggregate difference between the prior properly noticed payment amount and the payment amount associated with the Untimely or Missed PCN through the earlier of when: (1) a Properly Filed PCN was filed; (2) a Motion for Relief from Stay was filed; (3) the Bankruptcy Case was dismissed; or (4) the borrower received a discharge. The amount previously credited is approximately $3,000,000.00. However, any Active Account previously credited shall receive the credit described in Paragraph 16(a);

17.    Wells Fargo has identified approximately 3,000 Active Accounts for which: (a) there were Untimely or Missed PCNs; (b) the associated monthly payment decreased on the account; (c) the borrower or trustee paid more than the actual monthly payment amount due; and, (d) there was no prior or subsequent Untimely or Missed PCN for a payment increase. For those accounts, Wells Fargo will refund to the borrower or trustee, as appropriate, the aggregate amount paid in excess of the new actual monthly payment amount due through the earlier of when: (1) a Properly Filed PCN was filed; (2) a Motion for Relief from Stay was filed; (3) the Bankruptcy Case was dismissed or converted; or (4) the borrower received a discharge.

B.    **Escrow Corrective Action**

18.    Wells Fargo has identified approximately 18,538 Active Accounts that had one or more Escrow Analyses that exceeded the normal 12-month cycle (the "Delayed Escrow Cases"). In these cases, Wells Fargo will complete Escrow Analyses as if they had occurred at the 12-month mark (the "Pro Forma Analysis") and compare the Pro Forma Analyses to any other later prepared Escrow Analysis (the "Delayed Escrow Analysis"). If the Pro Forma Analysis shows:

a.    a shortage less than the shortage shown in the Delayed Escrow Analysis, Wells Fargo will credit the escrow account for the difference between the Delayed Escrow Analysis shortage and the Pro Forma Analysis shortage; or

b.    a surplus of $50 or more and the borrower is current under a confirmed plan in the Bankruptcy Case or current as of the conversion or dismissal of the Bankruptcy Case, Wells Fargo will refund the amount of the surplus to the borrower or trustee, as appropriate.

19.    In approximately 12,000 of the Delayed Escrow Cases, the borrower is not already included in the crediting population under Paragraph 16(a) and the escrow payment would have changed and a PCN would have been filed had the escrow analysis not been delayed (the "Delayed Escrow PCN Cases"). In each of the Delayed Escrow PCN Cases, Wells Fargo will credit the borrowers' account in the amount of $333.33.

20.    For the Escrow Shortage Borrowers, Wells Fargo will refund all amounts overpaid by the borrower or trustee on account of the monthly payment amount not having been decreased to reflect the lump sum payment of the escrow shortage by the Escrow Shortage Borrowers, and file a Properly Filed PCN, if necessary.

C.    <u>General Corrective Action Obligations</u>

21.    Wells Fargo shall: (a) send a written notice to all borrowers (and if the Bankruptcy Case is still active, the borrower's counsel and bankruptcy trustee) who receive a credit or refund as provided under Paragraphs 16 (a)-(b), and/or 17-20 informing them of the credit to their account or refund, and the reason for the credit or refund; and (b) will file a Properly Filed PCN if required in accordance with the Bankruptcy Rules.

22.    Wells Fargo confirms that, as a matter of practice, it does not impose post-petition late fees on borrowers in the course of a Bankruptcy Case (the "Late Fee Policy").

23.    Wells Fargo confirms that it has adhered to, and will continue to adhere to, the Late Fee Policy in any Bankruptcy Case in which Wells Fargo filed an Untimely PCN or failed to file a Missed PCN during the Relevant Period.  Wells Fargo further confirms that it has a policy not to impose additional fees, penalties, or charges on a borrower in a Bankruptcy Case as a result of an Untimely PCN or because there was an Missed PCN (collectively with the Late Fee Policy, the "PCN Policies").  Wells Fargo confirms that it has adhered during the Relevant Period, and will continue to adhere, to the PCN Policies in Bankruptcy Cases.  If it is determined that Wells Fargo did not adhere to the PCN Policies in any Bankruptcy Case, Wells Fargo will take appropriate corrective action and remediation, including crediting the borrower's mortgage loan account with all amounts assessed or imposed against the borrower in contravention of the PCN Policies or refunding all amounts improperly collected in contravention of the PCN Policies.

24.    In the event Wells Fargo previously resolved any objection to or adversary proceeding regarding a PCN, and the dispute was related to the timeliness of the PCN, Wells Fargo shall have no further obligation under this Order to pay any borrower or bankruptcy trustee on account of such PCN.

25.    In those cases in which an Untimely PCN was filed or where a Missed PCN was not filed during the Relevant Period, the Bankruptcy Case is still pending and the borrower or bankruptcy trustee has disputed a payment increase or fees, charges, and costs imposed in connection therewith at the time of execution of this Order, and the overall result is thereafter successful, Wells Fargo will reimburse the borrower for his or her reasonable attorneys' fees. Provided, however, that in order to identify such instances, Wells Fargo shall only be required to review any internally maintained list of bankruptcy matters and to request its outside bankruptcy counsel to bring any such cases to Wells Fargo's attention.  If a case that meets the criteria described in the first sentence of this paragraph is brought to Wells Fargo's attention by a borrower, trustee, the Independent Reviewer or the USTP, then Wells Fargo will also reimburse such borrower for his or her reasonable attorneys' fees.

26.    Wells Fargo shall complete all affirmative obligations in Paragraphs 16(a),  17-20 and 25 on or before November 30, 2016, (the "PCN and Escrow Corrective Action Date"), unless a later date is agreed to by the Parties in writing.

27.    Wells Fargo's obligations under Paragraphs 16(b) and 21 shall be completed as set forth herein.

## ARTICLE VII

## INDEPENDENT REVIEW

28.     The Parties have selected Lucy Morris as independent   reviewer (the "Independent Reviewer") with respect to this Order, subject to the provisions of this Article and a Retention Agreement and Work Plan to  be  negotiated  between the  Independent  Reviewer and Wells Fargo  as  defined and described below.   The process for selecting the Independent Reviewer required that Wells Fargo submit three candidates to the USTP for selection.

29.     Wells Fargo will pay reasonable fees and costs arising out of the retention of the Independent   Reviewer,   including   compensation   and reimbursement of expenses to the Independent Reviewer and her professionals.  If the Independent Reviewer is at any time unable to complete his or her duties under this Order, the parties shall mutually agree upon a replacement.

30.     The Independent Reviewer will be entitled to retain professionals with the qualifications, expertise, and skills appropriate for the tasks required under this Article.

31.     Any professionals retained by the Independent Reviewer shall not have been, within the two (2) years before the date of this Order, an equity security holder, director, officer, employee, or agent of Wells Fargo.

32.     The Independent Reviewer and h e r  professionals will disclose to this Court any connections they have to Wells Fargo, its  subsidiaries, directors, or officers in the manner provided under section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014.

33.     The Independent Reviewer must agree not to be retained by Wells Fargo for a period of two (2) years after the conclusion of the terms of this engagement, unless a shorter time period is agreed to by the Parties.

34.     Any professionals retained by the Independent Reviewer who work on the engagement must agree not to work on behalf of, or render services to, Wells Fargo for a period of one (1) year after the conclusion  of the term of this engagement,  unless the Parties consent to such retention, which consent shall not be unreasonably withheld.

35.     Any professional firm (including any law partnership or corporation  or accounting partnership or corporation) retained by the Independent Reviewer must agree not to work on behalf of, or render services to, Wells Fargo related to Wells Fargo's servicing of residential mortgages for a period of one (1) year after the conclusion of the  terms  of  this engagement, unless a shorter time period is agreed to by the Parties.

36.     It shall be the responsibility of the Independent Reviewer to undertake certain assessments as set forth in Paragraph 45 to determine whether Wells Fargo is in compliance with the corrective action obligations set forth in Article VI and other obligations set forth in this Order.

37. Wells Fargo and the Independent Reviewer shall enter into a retention agreement providing for, among other things, payment of fees and costs, confidentiality, privacy of customers, methods for transmittal of information, and an end of contract method for dealing with work papers (the "Retention Agreement") to be agreed upon by Wells Fargo and the Independent Reviewer within 90 days from the later of the entry of this Order or the selection of the Independent Reviewer.

38. The manner in which the Independent Reviewer will carry out her compliance responsibilities under this Order and, where applicable, the methodologies to be utilized shall be set forth in a work plan agreed upon by Wells Fargo and the Independent Reviewer (the "Work Plan") within 90 days from the later of the entry of this Order or the selection of the Independent Reviewer. Wells Fargo or the Independent Reviewer shall provide to the EOUST a copy of the Work Plan once agreed to by Wells Fargo and the Independent Reviewer.

39. The Retention Agreement and Work Plan entered into between the Independent Reviewer and Wells Fargo shall include terms protecting the confidentiality of information shared by Wells Fargo with the Independent Reviewer. Nothing in this provision shall prevent the Independent Reviewer from providing USTP, orally or through written communication, with information concerning Wells Fargo's implementation and compliance with the terms of this Order.

40. The Independent Reviewer may request access to other documents or information relevant to the scope of the assessments and reasonably necessary for the Independent Reviewer to fulfill her duties, including employee interviews and access to Wells Fargo's Executive Office bankruptcy related complaints. Access to such documents and information shall not be unreasonably withheld by Wells Fargo.

41. The Work Plan shall include a process whereby the accuracy and completeness of: (1) the identification of impacted borrowers, and (2) the provision of credits and/or refunds required in Paragraphs 16(a), 16(c), and 17-20 will be independently certified by a designated team within Wells Fargo Audit Services, which is the internal audit department of Wells Fargo. The designated team shall be independent of the line of business whose performance is being measured. The Work Plan may also set forth that Wells Fargo Audit Services may perform additional work related to the assessments required under Paragraph 45 as agreed upon between the Independent Reviewer and Wells Fargo. Wells Fargo Audit Services reports directly to the Chief Audit Officer, who reports directly to the Audit and Examination Committee of the Wells Fargo Board of Directors. After completing its determination of the accuracy and completeness of:

> a. the populations, Wells Fargo Audit Services will submit a certification to the Independent Reviewer and provide a copy to the EOUST prior to November 30, 2016, unless otherwise agreed to by the parties; and

> b. the provision of credits and/or refunds required in Paragraphs 16(a), 16(c), and 17-20, Wells Fargo Audit Services will submit a certification to the Independent Reviewer and provide a copy to the EOUST on or before 60 days

following submission of final information to Wells Fargo Audit Services, but no later than November 30, 2016, unless agreed to by the Parties.

42.    The Work Plan will detail the process for how Wells Fargo Audit Services will provide the Independent Reviewer with work papers associated with its review. The Independent Reviewer and any professionals retained by the Independent Reviewer will be subject to appropriate confidentiality restrictions. The Independent Reviewer shall have access to the work papers, which shall include screen shots of Wells Fargo's systems of record, account records, and any other documents or information relevant to the scope of the assessments and reasonably necessary for the Independent Reviewer to fulfill her duties.

43.    The Work Plan and the Retention Agreement, as necessary, will specify the sampling methodology to be used in connection with the assessments set forth therein, and provide for a reasonable margin of error in any review of the sample of filings.

44.    Subject to appropriate confidentiality restrictions and without waiving Wells Fargo's right to invoke the attorney-client privilege, the work product doctrine and other privileges, Wells Fargo shall provide the Independent Reviewer with reasonable access to documents and records relevant to the operational enhancements implemented by Wells Fargo under this Order and reasonably necessary for the Independent Reviewer to complete the assessment under Paragraph 45(a).

45.    The Independent Reviewer's mandate shall be to assess only the following:

a.    That Wells Fargo has implemented the Operational Enhancements described in Article V herein. The Independent Reviewer shall utilize a review methodology that is agreed upon between the Independent Reviewer and Wells Fargo in undertaking this assessment;

b.    That Wells Fargo has implemented the account reconciliation and crediting processes required under Paragraph 16(b) and is complying with its affirmative obligations thereunder. The Independent Reviewer shall utilize a review methodology that is agreed upon between the Independent Reviewer and Wells Fargo in undertaking this assessment;

c.    That each of the populations identified in Paragraphs 16(a) and 17-20 are substantially accurate by conducting a review of such accounts. The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

d.    That for each of the 42,756 Active Accounts described in Paragraph 16, Wells Fargo has credited each account consistent with the requirements of Paragraph 16 within the time required under this Order. The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

e.    That for each of the 18,538 Active Accounts described in Paragraph 18, Wells Fargo credited the borrower's account or refunded any surplus consistent with the requirement of Paragraph 18 within the time required under this Order.

Case 11-33377

The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

f.  That for each of the Delayed Escrow Cases described in Paragraph 19, Wells Fargo credited the borrowers' account as required under Paragraph 19 within the time period required under this Order. The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

g.  That for each of the Escrow Shortage Borrowers described in Paragraph 20, Wells Fargo refunded to the borrower or trustee the amounts required under Paragraph 20 within the time period required under this Order. The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

h.  That for each of the Active Accounts described in Paragraph 17, Wells Fargo refunded the amounts required under Paragraph 17 within the time required under this Order.  The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

i.  That Wells Fargo is complying with its affirmative obligations under Paragraph 23 through a review methodology that is agreed upon between the Independent Reviewer and Wells Fargo in undertaking this assessment;

j.  That Wells Fargo has fulfilled all affirmative requirements under Paragraph 25 within the time required under this Order.  The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

k.  That, subsequent to the Relevant Period, Wells Fargo: (a) is timely performing and communicating Escrow Analyses for borrowers in Bankruptcy Cases, and (b) has filed Properly Filed PCNs in Bankruptcy Cases involving loan modifications     The Independent Reviewer shall utilize a sampling methodology in undertaking this assessment;

l.  That Wells Fargo is complying with the notice requirements set forth in Paragraph 21 through a review methodology that is agreed upon between the Independent Reviewer and Wells Fargo in undertaking the assessment; and

m.  That PCNs filed by Wells Fargo subsequent to the Relevant Period are filed consistent with the timing and notice requirements of Bankruptcy Rule 3002.1.  The Independent Reviewer shall utilize a review methodology that is agreed upon between the Independent Reviewer and Wells Fargo.

46.     The Independent Reviewer shall report on Wells Fargo's ongoing compliance with the terms of this Order on a semi-annual basis (the "Semi-Annual Reports") so long as this Order remains effective as set forth in Paragraph 65.  Prior to issuing any Semi-Annual Report, the Independent Reviewer shall provide a copy of the draft report to and consult with the Parties regarding her preliminary findings.  Wells Fargo may submit comments to the Independent Reviewer, which shall either be appended to or otherwise incorporated into the final version of

such report as appropriate in the Independent Reviewer's discretion, exercised reasonably. Within a reasonable time after the consultation, the Independent Reviewer shall finalize the Semi-Annual Report and provide copies to the EOUST and Wells Fargo. The Independent Reviewer shall file the Semi-Annual Report with this Court after having provided the EOUST and Wells Fargo with a copy.

47.     If delivery of a report of an assessment is required under Paragraphs 48-49, then the deadline for delivering the report shall be: (i) 180 days from delivery of the certifications in Paragraphs 41(a) and 41(b), or (ii) 180 days from November 30, 2016 for those assessments not subject to the certifications required under Paragraphs 41(a) and 41(b).

48.     With respect to the determinations in each of the Sub-paragraphs of Paragraph 45, if the Independent Reviewer's assessment concludes that Wells Fargo has met the standard or fulfilled the condition required by the sub-paragraph, then the Independent Reviewer will include this determination as a final assessment in her next scheduled Semi-Annual Report under paragraph 46; appointment of the Independent Reviewer with respect to that assessment shall terminate and the Independent Reviewer shall have no further duties with respect to such assessment and shall take no further action with respect to the subject matter of that assessment.

49.     With respect to the determinations in each of the Sub-Paragraphs of Paragraph 45, in the event the Independent Reviewer's assessment concludes that Wells Fargo has not yet met the standard or fulfilled the condition required by the assessment:

a.   The Independent Reviewer shall deliver to the Parties a report of her assessment in accordance with the time limits set forth in Paragraph 47. Wells Fargo shall have 30 days (which deadline may be extended by agreement in writing by the Independent Reviewer and Wells Fargo) to provide additional information to the Independent Reviewer or to object to the Independent Reviewer's assessment. The Independent Reviewer shall consider such information or objections in good faith. No later than 60 days (which deadline may be extended by agreement in writing by the Independent Reviewer and Wells Fargo) following the delivery of the assessment, the Independent Reviewer shall file her assessment with the Court; and

b.   Wells Fargo shall submit to the Independent Reviewer for her approval a corrective action plan and the appointment of the Independent Reviewer with respect to that particular sub-paragraph assessment shall continue. Once approved, Wells Fargo shall implement the corrective action plan within the time set forth therein and, provided the Independent Reviewer determines that Wells Fargo has fully and successfully implemented such corrective action plan, the Independent Reviewer shall file a final assessment that states that Wells Fargo has met the standard or satisfied the condition of the sub-paragraph at issue; appointment of the Independent Reviewer with respect to that assessment shall terminate and the Independent Reviewer shall have no further duties with respect to

14

such assessment and shall take no further action with respect to the subject matter of that assessment. In addition to implementing the corrective action plan, Wells Fargo will remediate any borrower harm caused by the failure to fulfill the sub-paragraph at issue.

50.     The Independent Review shall conclude when the Independent Reviewer has completed and filed a final assessment under either Paragraph 48 or 49 for each of the Sub-Paragraphs of Paragraph 45. After the conclusion of the Independent Review, the Independent Reviewer shall file a final Report setting forth the results of the Independent Review and disclosing her findings and conclusions. The final Report shall include a discussion of the Operational Enhancements implemented by Wells Fargo and their impact on Wells Fargo's ability to file Properly Filed PCNs. The final Report shall be filed within 90 days of the conclusion of the Independent Review under this paragraph. Except as otherwise provided in Paragraph 65, this Order shall remain in effect until the final Report is filed.

51.     Each of the time limits set forth in Paragraph 47 can be extended if agreed to in writing by the Parties.

52.     Either the Independent Reviewer or Wells Fargo may seek relief from the Court in the event that a dispute develops concerning the Independent Review that cannot be resolved through good faith negotiations between the Independent Reviewer and Wells Fargo.

## **ARTICLE VIII**

## **RELEASE**

53.     Upon becoming effective as set forth in Paragraph 65:

   a.   The USTP consents and agrees to fully and finally release any claims, and will refrain from instituting, directing or maintaining any contested matter, adversary proceeding or participating in any contested matter or adversary proceeding by a third party (except that the United States Trustees may participate in an action to the extent ordered by a court provided that the United States Trustees may not seek such a court order formally or informally), against Wells Fargo pertaining to the Covered Conduct and arising out of or relating to Untimely PCNs, Missed PCNs, or Untimely Escrow Analyses.

   b.   The USTP and Wells Fargo consent and agree to take such steps as may be reasonably necessary to fully and finally withdraw or facilitate the dismissal with prejudice of pending contested matters, adversary proceedings, and all related discovery requests, whether formal or informal, pertaining to the Covered Conduct and arising out of or relating to Untimely PCNs, Missed PCNs, or Untimely Escrow Analyses.

c.  Wells Fargo consents and agrees to fully and finally release the USTP and its current and former employees from claims under the Equal Access to Justice Act, 28 U.S.C. § 2412 based on the USTP's investigation and prosecution of claims pertaining to the Covered Conduct; and

d.  Notwithstanding the foregoing, nothing in this Paragraph shall be construed as a waiver of, or a restriction or prohibition on, the USTP's ability:

i.  In individual Bankruptcy Cases to seek corrective action and remediation (but not sanctions, fines or punitive damages) arising out of or related to the Covered Conduct where Wells Fargo fails to take corrective action or remediation required by this Order within the time frames established under this Order;

ii.  In individual Bankruptcy Cases to undertake any formal or informal action with respect to any: (1) PCN or (2) Escrow Analysis , except to the extent that a PCN or escrow related filing is untimely because it is part of the corrective action required by the terms of this Order and the filing is otherwise within the time frames established under this Order;

iii.  In individual Bankruptcy Cases to undertake any formal or informal action with respect to any filing by Wells Fargo in a Bankruptcy Case not based on the Covered Conduct;

iv.  To seek and obtain discovery in any Bankruptcy Case or proceeding, including discovery based on or pertaining to the Covered Conduct, as long as such discovery is not sought for the purpose of enforcing claims or causes of action released herein;

v.  To assert defenses or claims against any other party, and the USTP shall have no obligation to seek dismissal of any pending adversary proceedings, contested matters, appeals, and other actions filed by the USTP against any other party in matters pertaining to the Covered Conduct and arising out of or relating to Untimely PCNs, Missed PCNs, or Untimely Escrow Analyses; and

vi.  To cooperate with or provide assistance to other governmental agencies in connection with the Covered Conduct, or sharing information or discovery arising out of or pertaining to the Covered Conduct with other governmental agencies.

e.  The scope of the matters being resolved via this Order is limited to the Covered Conduct.  This Order does not settle, resolve, or prejudice any other rights or claims against Wells Fargo, including claims arising under the National Mortgage Settlement pertaining to matters other than Covered

16

Conduct. Notwithstanding any other provision of this Order claims with respect to any criminal liability are especially reserved and are not released.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

54.    The Court shall retain exclusive jurisdiction over all matters subject to this Order, including disputes arising under this Order, construction, interpretation, modification and enforcement of this Order, and shall retain exclusive jurisdiction to hear and adjudicate any motions related to this Order.

55.    This Order (and its contents) is not and shall not be used as an admission of liability, violation, or wrongdoing by Wells Fargo to any person or entity or on any legal or equitable theory. This Order is made without trial or adjudication of any issue of fact or law and does not contain any injunctive measures against Wells Fargo.

56.    This Order will not bind or prejudice the rights and claims of non-Parties. This Order binds Wells Fargo, and its respective corporate successors and assigns.

57.    This Order does not alter the Parties' rights, releases and obligations under the National Mortgage Settlement or any other settlements, agreements or orders to which Wells Fargo is a party.

58.    This Order does not prohibit Wells Fargo from making other or additional changes to the bankruptcy policies and procedures addressed in this Order, provided that such policies and procedures continue to comply with the Bankruptcy Code and Rules and are not otherwise inconsistent with the terms of this Order. If this Order provides that a notice will be sent to a borrower and such a notice has not already been mailed as of the effective date of this Order, then the USTP shall have the right to review the notice and approve the portion of the notice that references the reason for the notice, but this approval shall not be unreasonably withheld.

59.    In the event of a sale of the mortgage servicing rights for a loan subject to or covered by this Order, Wells Fargo shall either (a) fulfill its obligations under Article VI prior to transferring servicing of such loan, or (b) require that the transferee servicer provide the remediation specified in Paragraphs 16-20 for such loan. In the event that Wells Fargo transfers the mortgage servicing of any loan subject to or covered by this Order pursuant to regulatory requirement or directive, or investor requirement (including but not limited to Fannie Mae, Freddie Mac, Ginnie Mae, the Federal Housing Administration, the Department of Veterans Affairs or the Department of Agriculture), Wells Fargo shall use its best efforts to ensure that the new servicer cooperates in its efforts to effectuate the applicable relief set forth in Paragraphs 16-20; provided, however, that the USTP agrees and acknowledges that Wells Fargo cannot control the actions of any third party servicer with respect to such requests. As part of its best efforts, when contacted by a borrower impacted by a transfer of servicing, Wells Fargo shall direct the borrower to the appropriate contacts at the successor servicer with knowledge of Wells Fargo's request to honor the relief set forth above.

60.    This Order constitutes the entire agreement between the Parties relating to the subject matter reflected herein and may not be modified except in writing executed and delivered by the parties hereto. However, should Wells Fargo become engaged in a dispute, including an actual or threatened contested matter, adversary proceeding or other litigation with an individual borrower, then Wells Fargo shall have the discretion to provide different relief to such a borrower with his or her written consent and to take other customary litigation precautions.

61.     This Order may be executed by the Parties in one or more counterparts, or via facsimile or electronically scanned signatures, each of which shall be deemed an original, all of which together shall constitute one and the same instrument.

62.    In no event shall Wells Fargo be required to refund or credit, or take other actions as specified in Paragraphs 16-20 above to a borrower or trustee in a Bankruptcy Case if such refund or credit has previously been made to any such party in the case; e.g., Wells Fargo shall not be required to refund distributions or make a payment to the chapter 13 trustee if refunds or payments have already been made to the debtor, and vice-versa.

63.    The costs, fees and expenses of the Independent Reviewer and any of her professionals shall be actual and reasonable as applied to professional persons under 11 U.S.C. §§ 328 and 330.  Should Wells Fargo deem the costs, fees and expenses incurred by the Independent Reviewer or any of her professionals to be unreasonable, it shall be authorized to seek reduction or disallowance of such fees from this Court, and this Court shall apply the same standards for professional fees as is appropriate under 11 U.S.C. § 330.

64.    Wells Fargo shall in no event be required to provide any information hereunder to the USTP which shall constitute a violation of any federal or state law, including, but not limited to, privacy laws and the Truth In Lending Act, without an express order compelling such delivery by this Court.

65.    This Order shall become effective upon the running of any appeal period following its execution by the Parties and its entry by the Court.  Wells Fargo's obligations under this Order shall end as described in Paragraph 50, except as provided in Paragraphs 16(b) and 21, which shall terminate upon completion of the actions described therein.

66.    In the event the USTP determines that Wells Fargo is in violation of this Order, it shall provide notice of such violation to Wells Fargo and provide Wells Fargo 45 days to cure or otherwise purge the conduct deemed by the USTP to constitute the violation prior to the filing of any motion to enforce this Order in this Court, unless more time agreed to by the Parties.

67.    Wells Fargo recognizes that the USTP is entering into this Order in reliance on the material accuracy and material completeness of the factual representations set forth herein and that in the event of fraud or misrepresentation of material facts the USTP may seek relief from the final judgment in accordance with FRCP 60(b) and other authorities, subject to providing reasonable notice to Wells Fargo and opportunity for Wells Fargo to respond.

68.    If any time period in this Order is stated in days, the Parties and the Reviewer shall: (1) exclude the day of the event that triggers the period; and (2) count every subsequent day, including intermediate Saturdays, Sundays and legal holidays and include the last day of the

period, but if any time period set forth in this Order expires on a Saturday, Sunday or legal holiday, such time period shall continue to run until the end of the next day that is not a Saturday, Sunday or legal holiday.

69.    Any payments required to be made under this Order shall be deemed made when deposited in the United States mail, postage prepaid and addressed to the last known notice address for a loan.  Any payee's failure or refusal to accept such payment shall not be deemed a breach of Wells Fargo's obligations under this Order.  Upon written request, Wells Fargo shall reissue a check that the payee failed to timely negotiate provided that such request is received prior to March 31, 2016.


Seen and agreed to:

**WELLS FARGO BANK, N.A.**

  /s/ *Michael DeVito*
Michael DeVito, Executive Vice President
Wells Fargo Home Mortgage
Wells Fargo Bank, N.A.
One Home Campus – X2401-064
Des Moines, IA  50328

  /s/ *Soyong Cho*
Soyong Cho, Bar No. 17132
1601 K Street, NW
Washington, DC 20006
(202) 778-9000
soyong.cho@klgates.com

**EXECUTIVE OFFICE FOR UNITED STATES TRUSTEES**


  /s/ *Ramona D. Elliott*
Ramona D. Elliott, Deputy Director/General Counsel (Bar No. 05738)
Executive Office for United States Trustees
United States Department of Justice
441 G Street, NW
Suite 6150
Washington, DC  20530


**END OF ORDER**

# EXHIBIT A

1

| Issue | Approximate Number of Active Accounts | Corrective Action[3] | Total Approximate Credit or Refund |
|---|---|---|---|
| Untimely or Missed PCNs – Payment Increases - Lump Sum Payment | 42,756 | For any Active Account that had an increase in payment where Wells Fargo had an Untimely PCN or a Missed PCN, credit the account a lump-sum amount depending on the unpaid principal balance at the time of the credit.[4] | $53,600,000 |
| Untimely or Missed PCNs - Reconciliation Process | 42,756 | To the extent the lump-sum credit described above is less than the actual amount of the increase, credit any Active Account that had an increase in payment the actual amount of the increase in payment during the reconciliation process that occurs at discharge, conversion, dismissal, or stay relief where Wells Fargo had an Untimely PCN or a Missed PCN. | $10,000,000 |
| Untimely or Missed PCNs - Prior Remediation | 8,000 | Wells Fargo has previously credited the actual amount of the increase in payment where it had an Untimely or Missed PCN. | $3,000,000 |
| Untimely or Missed PCNs - Payment Decreases - Account Level Review | 3,000 | For any Active Account that had a decrease in payment where Wells Fargo had an Untimely PCN or a Missed PCN, refund the account the actual difference between the higher payment and the lower payment, which would have been reflected on the PCN. | $1,500,000 |
| Delayed Escrow Analysis Including an Untimely or Missed PCN | 6000 | Credit any borrower with an active account who, while they were in Ch.13 bankruptcy, had an escrow analysis performed outside of the normal 12 month cycle and had an increase in their shortage caused by the delay in the escrow analysis.  Wells Fargo will perform an escrow analysis as of the 12 month date and credit the account for any difference between the shortage at the time of the analysis and the shortage showing at the time the escrow analysis was actually performed. | $4,500,000 |
| Delayed Escrow Analysis Not Included in the Untimely or Missed PCN Population | 12000 | Credit the account $333.33 for any Active Account that had a Delayed Escrow Analysis and did not also have a corresponding Untimely or Missed PCN. | $4,000,000 |
| Unrefunded Escrow Surplus at Time of Annual Escrow Analysis | 6000 | Refund any Active Account that, while the borrower was in Ch.13 bankruptcy, had an escrow analysis performed outside of the normal 12 month cycle and following a pro forma escrow analysis that shows a surplus in excess of $50 and the surplus was not previously refunded or credited toward the next year's escrow payments. | $4,000,000 |
| Lump Sum Escrow Shortage Payment | 2400 | Refund any Active Account where the customer paid the amount of their escrow shortage identified in an annual escrow analysis but did not have their payment adjusted for the following year's payment amount. | $1,000,000 |
| | Aggregate Approximate Number of Unique Impacted Accounts[5] | | Aggregate Approximate Credit or Refund |
| | 67,800 | | $81,600,000 |

---

[3] These descriptions summarize proposed action, but language of the Order controls over this summary.
[4] This includes those PCNs that were treated as an increase regardless of the actual status of the PCN.
[5] The aggregate number of accounts is inclusive of all accounts impacted by this Order, and is not a sum of the accounts impacted in the individual issue categories.